1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Amar L. Thakur (Bar No. 194025)
2     amarthakur@quinnemanuel.com
      Bruce R. Zisser (Bar No. 180607)
3     brucezisser@quinnemanuel.com
      David Grable (Bar. No. 237765)
4     davegrable@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:   (213) 443-3100

7  Joshua L. Sohn (Bar No. 250105)
      joshuasohn@quinnemanuel.com
8  777 6th Street NW, 11th Floor
   Washington, D.C. 20001
9  Telephone:  (202) 538-8000

10 Attorneys for Defendants
   NOVATEL WIRELESS, INC., VERIZON
11 COMMUNICATIONS, INC., AND
   CELLCO PARTNERSHIP D/B/A
12 VERIZON WIRELESS

13              UNITED STATES DISTRICT COURT

14              SOUTHERN DISTRICT OF CALIFORNIA

15

16 CARUCEL INVESTMENTS, L.P., a              NO. 3:16-CV-00118-H-KSC
17 Delaware limited partnership,
                        Plaintiff,           **DEFENDANTS' OPPOSITION TO
18                                           CARUCEL'S *DAUBERT* MOTION
          v.                                 REGARDING DR. DEFOREST
19                                           MCDUFF
   NOVATEL WIRELESS, INC., a
20 Delaware corporation, VERIZON
   COMMUNICATIONS, INC., a Delaware
21 corporation, CELLCO PARTNERSHIP
   D/B/A VERIZON WIRELESS, a
22 Delaware general partnership,

23
                        Defendants.
24

25               **[PUBLIC REDACTED VERSION]**
26

27

28

06592.00001/9106385.2                                    Case No. 13:16-CV-00118-H-KSC
   DEFENDANTS' OPPOSITION TO CARUCEL'S *DAUBERT* MOTION REGARDING DR. DEFOREST MCDUFF

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................... 1

II.   LEGAL STANDARD ........................................................................ 2

III.  FACTUAL BACKGROUND ............................................................ 2

    A.   Dr. McDuff's Apportionment Methodology ........................... 3

        1.   Dr. McDuff's Relevant Use Apportionment ................................. 3

        2.   Dr. McDuff's Price-Based Apportionment ................................. 4

    A.   Dr. McDuff's Analysis of Comparable Licenses.................... 5

IV.  ARGUMENT ..................................................................................... 7

    A.   Dr. McDuff's Apportionment Is Firmly Grounded In Accepted Methodology ................................................................ 7

        1.   Dr. McDuff's Relevant Use Apportionment Properly Ties the Royalty Base to the Value of the Claimed Invention ............. 7

        2.   Dr. McDuff Does Not "Double Count" Apportionment ............ 10

        3.   Dr. McDuff Is More Than Qualified To Opine On the Value of Carucel's Invention...................................................... 10

        4.   User Statistics Are a Reliable Basis For Estimating Relevant Use .......................................................................... 11

        5.   Dr. McDuff's Reliance On Time Use Surveys Is Reasonable and Reliable............................................................. 13

        6.   Dr. McDuff's Price-Based Apportionment Properly Accounts For the Value of Later-Added Non-Infringing Functionality .................................................................... 14

    B.   Dr. McDuff's Analysis of the Gogo Settlement Is Proper.................... 15

    C.   Dr. McDuff's Analysis of Comparable Novatel Licenses Is Closely Tied to the Facts of the Case...................................................... 16

V.   CONCLUSION ............................................................................... 18

# TABLE OF AUTHORITIES

**Page**

## Cases

*2-Way Computing, Inc. v. Sprint Solutions, Inc.*,
No. 2:11-cv-12, 2015 WL 2365648 (D. Nev. May 18, 2015)............................ 17

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ...................................................... 17

*Cohen v. Trump* **[NO CITATION]**
................................................................................. 7

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ...................................................... 14

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .......................................................... 2,1 3, 17

*Droplets, Inc. v. Overstock.com, Inc.*,
No. 2:11-CV-401-JRG-RSP, 2015 WL 11120843
(E.D. Tex. Jan. 7, 2015) ............................................................ 14

*Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*,
No. 4:13CV1043SPM, 2015 WL 8916113
(E.D. Mo. Dec. 15, 2015) ............................................................. 9

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 .................................................................... 7, 10

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
No. 13-CV-03999-BLF, 2015 WL 4272870
(N.D. Cal. July 14, 2015) ......................................................... 9, 12

*GPNE Corp. v. Apple, Inc.*,
No. 12-CV-02885-LHK, 2014 WL 1494247
(N.D. Cal. Apr. 16, 2014) ............................................................ 8

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ...................................................... 2, 11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ........................................................ 2, 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ..................................................... 2, 11

*In re Maxim Integrated Prods., Inc.*,
No. 12-945, 2015 WL 5311264 (W.D. Pa. Sept. 11, 2015) ............................... 16

*Omega v. Calamp,* **[NO CITATION]**
................................................................................. 7

*Oracle Am., Inc. v. Google Inc.*
    No. 10-03561 WHA 2011 U.S. Dist. LEXIS 136172
    (N.D. Cal. Nov. 28, 2011)1 ................................................................................. 11

*PerdiemCo, LLC v. Industrack LLC*,
    No. 2:15-CV-726-JRG-RSP, 2016 WL 6611488
    (E.D. Tex. Nov. 9, 2016) .......................................................................... 15, 16

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ......................................................................... 11

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ............................................................................. 8

*Sentius Int'l, LLC v. Microsoft Corp.*,
    No. 5:13-CV-00825-PSG, 2015 WL 331939
    (N.D. Cal. Jan. 23, 2015) .................................................................................. 11

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) .............................................................. 2, 10, 14

*Ultimatepointer, LLC v. Nintendo Co., Ltd.*,
    No. C14-0865RSL, 2014 WL 7340545
    (W.D. Wash. Dec. 22, 2014) .............................................................................. 14

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ....................................................................... 9, 14

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ......................................................................... 7, 9

## Statutes

Fed. R. Evid. 702 ................................................................................................ 2, 10

# I.     INTRODUCTION

Carucel's damages claim has now swollen to *$45 million* based on a per unit royalty rate of $8 for each Accused Product.  This per-unit royalty exceeds what Novatel pays ███████ for a license to thousands of fundamental patents on wireless communication.  The only way Carucel can credibly advance that figure in front of the jury is by convincing the Court to throw out the mountain of evidence demonstrating the absurdity of Carucel's claim—the fact that Carucel's only prior license netted a relatively paltry ██████ from a substantially larger accused infringer, the fact that Novatel has never paid or received anything close to that amount for MiFi-related licenses, and the fact that only a small fraction of MiFi users utilize Carucel's invention.[1]  All of this evidence is laid out and analyzed in the rebuttal damages report of Defendants' expert, Dr. DeForest McDuff.

Dr. McDuff's report is an entirely conventional damages analysis based on well-established principles of law, widely accepted methodologies, and undeniably relevant evidence.  Dr. McDuff presents four different damages models, based on the evidence Carucel wants to sweep under the rug—one model based on usage statistics and apportionment principles, and three based on license agreements entered into by the parties in this case.  Each model is closely tied to the facts of this case, based on sound methodology, and deserves to be heard by the jury.

Carucel finds fault with Dr. McDuff's analysis by mischaracterizing his opinions, misstating the law, and criticizing Dr. McDuff's supposed "failure" to meet requirements that simply do not exist.  Carucel also repeatedly asks the Court to make new law—to become the first Court to exclude a defense expert for apportioning *too much*, for example, or to find that a license *involving the patents-in-suit* is somehow not comparable.  In the end, Carucel does not provide this Court

---

[1]  Since this Opposition relates to damages, it assumes a finding of infringement.

DEFENDANTS' OPPOSITION TO CARUCEL'S *DAUBERT* MOTION REGARDING DR. DEFOREST MCDUFF

1  with any basis to prevent the jury from considering Dr. McDuff's opinions.

2  Carucel's motion should be denied.

3  ## II.     LEGAL STANDARD

4         An expert witness may provide opinion testimony if: (1) "the testimony is

5  based upon sufficient facts or data;" (2) "the testimony is the product of reliable

6  principles and methods; and" (3) "the expert has reliably applied the principles and

7  methods to the facts of the case."  FED. R. EVID. 702; *see also Daubert v. Merrell*

8  *Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993).  Under *Daubert*, the trial court is

9  limited to a gatekeeping role and must be sure that its review of expert testimony

10  focuses "solely on principles and methodology, not on the conclusions that they

11  generate."  *Daubert,* 509 U.S. at 592–94, 596; *see also i4i Ltd. P'ship v. Microsoft*

12  *Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) ("*Daubert* and Rule 702 are safeguards

13  against unreliable or irrelevant opinions, not guarantees of correctness.").

14         Moreover, "estimating a reasonable royalty is not an exact science," *Summit*

15  *6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015), and

16  "necessarily involves an element of approximation and uncertainty."  *Lucent Techs.,*

17  *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).  Thus, if the expert's

18  "methodology is sound, and the evidence relied upon [is] sufficiently related to the

19  case at hand, disputes about the degree of relevance or accuracy . . . may go to the

20  testimony's weight, but not its admissibility."  *i4i*, 598 F.3d at 852.

21  ## III.    FACTUAL BACKGROUND

22         Dr. McDuff's damages analysis is based on the *Georgia-Pacific* factors and

23  hypothetical negotiation framework.  Dr. McDuff's analysis is grounded in two

24  widely recognized principles of patent damages law:  (1) that licenses for

25  comparable technology are informative of how the parties would value the patents-

26  in-suit in a hypothetical negotiation, and (2) the ultimate royalty must be

27  apportioned to exclude value that is not associated with the claimed invention.

28  *Summit 6,* 802 F.3d at 1297-98; *Lucent*, 580 F.3d at 1334; *LaserDynamics, Inc. v.*

1  *Quanta Computer, Inc.*, 694 F.3d 51, 78-79 (Fed. Cir. 2012).  Accordingly, Dr.

2  McDuff provides four primary damages models—one based on apportionment

3  principles, and three others based on comparable licenses—which lead him to

4  conclude the appropriate royalty range is between $74,573 and $250,000:[2]



A.      Dr. McDuff's Apportionment Methodology

Dr. McDuff applied a two-step apportionment to the royalty base to account for functionality that is unrelated to the patents-in-suit.  First, he reduced the royalty base according to the percentage of MiFi use that occurs while the user and device are in transit ("Relevant Use Apportionment").  (McDuff Report[3] ¶¶ 45e, 71a, Attachment D-1.)  Second, Dr. McDuff compared the price of later models of the accused products to the original MiFi 2200 in order to account for the value of non-infringing features added to later models ("Price-Based Apportionment.")  Each step is discussed below.

1.      Dr. McDuff's Relevant Use Apportionment

Dr. McDuff's Relevant Use Apportionment seeks to tie the royalty base to the economic value of Carucel's invention—a movable base station with multiple antennas that is constructed to move with users at high speeds.  Accordingly, Dr.

[2]  As indicated in the chart below, Dr. McDuff also provides three models based on adjustments and corrections to Dr. Kennedy's analysis .

[3]  The McDuff Report is attached as Exhibit 1 to the Declaration accompanying Plaintiff's *Daubert* motion.

1  McDuff looked at statistics showing how often MiFi users may actually be capable

2  of utilizing this capability.  Dr. McDuff primarily relies on Verizon usage

3  statistics—collected by Verizon in the ordinary course of its business—showing the

4  number of cell cites recorded during each MiFi session.  Due to practical constraints

5  — Verizon's servers are set up to store usage data for only 8 days — the reports

6  generated by Verizon were limited two 24-hour periods in two cities (Dallas and

7  Philadelphia) with high commuter rates.  Despite these restrictions, the Verizon data

8  provided a sample size of nearly ███ sessions.  In consultation with Dr. Kenney

9  and Verizon engineers, Dr. McDuff determined that connecting to four or more cell

10  towers indicated MiFi use while in transit, because users in densely populated areas

11  frequently connect with two or three cell towers even while stationary.  The Verizon

12  usage statistics show that only ███ of MiFi sessions were during transit, and thus

13  Dr. McDuff apportions the royalty base accordingly.  Because ███ represents the

14  time MiFi is capable of being used in transit, Dr. McDuff uses this apportionment

15  factor to calculate the high-end royalty under his apportionment methodology.

16       As a secondary method of estimating the percentage of MiFi use while in

17  transit, Dr. McDuff relies on certain studies published by the Bureau of Labor and

18  Statistics, the U.S. Census Bureau, and the Department of Transportation.  Using

19  these surveys, Dr. McDuff identifies the percentage of time spent traveling for work

20  or recreation.  He then factors out the travel time where the sole occupant of a

21  vehicle is the driver, based on the assumption that drivers would be far less likely to

22  use a MiFi device while operating a vehicle.  Based on these surveys, Dr. McDuff

23  determines that the relevant use case would represent 0.078% of overall work and

24  recreation time.  Dr. McDuff uses this apportionment factor (0.078%) to calculate

25  the low-end royalty under his apportionment methodology.

26              2.    Dr. McDuff's Price-Based Apportionment

27       Dr. McDuff's Price-Based Apportionment is intended to further account for

28  the value of non-infringing features added to MiFi products over time.  Later models

include a wide variety of features that were not present in the original MiFi 2200—the MiFi 6620L, for example, boasts an LCD display, support for up to 15 client devices, and dramatic improvements in security and connection speeds.  Dr. McDuff apportions the value of these later-added features by comparing the price of the MiFi 2200 to the price of more recent models.  This leads to an apportionment factor ranging between 0% and 41%, depending on the year.  (McDuff Report Attachment D-1.)  The Price-Based Apportionment is multiplicative—but not duplicative—of the Relevant Use Apportionment because all MiFi models have uses that are not relevant to the patents-in-suit, and all MiFi models (excluding MiFi 2200) have non-infringing features that were later added.  Dr. McDuff's two-step apportionment ensures that the royalty base is more closely tied to the value of Carucel's invention.

### A.    Dr. McDuff's Analysis of Comparable Licenses

The parties produced 19 licenses in this case.[4]  Based on extensive discussions with Dr. Kenney, as well as his own economic expertise, Dr. McDuff identifies eight of these licenses as comparable:

*Carucel-Gogo Settlement.*  Dr. McDuff applies the *Georgia-Pacific* factors to the ▮▮▮▮ settlement that Carucel obtained from Gogo, Inc.  In connection with *Georgia-Pacific* factors 9 and 10, Dr. McDuff identifies a crucial distinction between Gogo's products and the accused MiFi products—whereas MiFi devices are only used in transit ▮▮▮ of the time, Gogo's products are used in transit 100% of the time.  Because Gogo's products utilize the patented invention in every use case, he does not apply any apportionment along the lines of the Relevant Use Apportionment he applied with respect to Novatel.  Thus, Dr. McDuff compares the ▮▮▮▮ royalty to Gogo's revenues prior to the settlement and identifies an

---

[4]   Additional licenses were produced in connection with Dr. McDuff's Supplemental Report, which is the subject of other motion practice.

1    implied royalty rate of 0.075%, which he then applies to the apportioned royalty

2    base for Novatel's products.

3        _Novatel "In" Licenses._  Novatel produced 12 agreements in which it is the

4    licensee.  With one exception—Novatel's license to Qualcomm's entire CDMA

5    patent portfolio—these agreements license a small number of patents for a lump

6    sum royalty of ███████████ .  Dr. McDuff briefly discusses each Novatel "in"

7    license, but he only relies on three agreements:

8        • Novatel-Golden Bridge Technology Inc.: executed in 2012, lump

9            sum royalty of ████████ ;

10       • Novatel-EON Corp. IP Holdings LLC: executed in 2013, lump sum

11           royalty of ██████ ;

12       • Novatel-MLR, LLC:  executed 2005, ███████ royalty.

13   Dr. McDuff relies on these three agreements because Dr. Kenney identified them as

14   covering comparable technology, and Dr. McDuff himself determined that they

15   were economically comparable to the hypothetical negotiation in this case.  Dr.

16   McDuff concludes that these licenses support a royalty of $250,000.

17       _Novatel "Out" Licenses._  In 2013, Novatel assigned its MiFi-related patent

18   portfolio to third party Nova Intellectual Solutions, LLC.  Nova produced six

19   licenses in this case, which provide for royalties ranging from ████████████ .

20   Dr. McDuff relies on four of the six licenses—Nova's licenses with Sharp, Franklin

21   Wireless, Sony, and Blackberry—and discards the remaining two based on his

22   analysis that the agreements are not economically comparable.  More specifically,

23   Dr. McDuff excluded Nova's license with ZTE because it covered far more than just

24   WiFi products, and also chose not to rely on Nova's license with RPX Corp.

25   because of its unique circumstances as a patent clearinghouse.  After excluding

26   these two agreements, Dr. McDuff identifies a royalty range of $75,000 - $175,000

27   and concludes (based on the _Georgia-Pacific_ factors) that the appropriate amount

28   would be "the low end of the range . . . and no more than the midpoint of $125,000."

1

## IV.   ARGUMENT

2

A.   Dr. McDuff's Apportionment Is Firmly Grounded In Accepted Methodology[5]

3

4   Dr. McDuff did exactly what the case law says experts should do when

5   calculating a reasonable royalty for a product with infringing and non-infringing

6   functionality—he apportioned the royalty so that it is based on the value of the

7   claimed invention, and excluded the value of uses and functionalities that are not

8   attributable to Carucel's invention.  As the Federal Circuit has recognized, the

9   "essential requirement" of apportionment is "that the ultimate reasonable royalty

10   award must be based on the incremental value that the patented invention adds to the

11   end product."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir.

12   2014; *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014)

13   ("estimate what portion of the value of that product is attributable to the patented

14   technology.").  Dr. McDuff meets that requirement in two steps, apportioning the

15   royalty base to exclude (1) the value of MiFi use that is not attributable to Carucel's

16   invention, and (2) the value of unpatented features added to the accused MiFi

17   products over time.  In short, Dr. McDuff presents a garden-variety apportionment

18   analysis based on reliable data and well-established legal principles.  Carucel's

19   *Daubert* attacks on that analysis should be denied.

1.   Dr. McDuff's Relevant Use Apportionment Properly Ties the Royalty Base to the Value of the Claimed Invention

20

21   Carucel asserts that Dr. McDuff's apportionment for relevant use is based on

22   an incorrect assumption that MiFi devices only infringe when used at high speeds.

23

24   [5]   Carucel points to two instances where Dr. McDuff's reports were partially
excluded in other cases.  Both of these orders are irrelevant to any of the issues in

25   this case.  Dr. McDuff's exclusion in *Omega v. Calamp* related to apportionment via

26   a "word count methodology" and "bargaining methods," neither of which were used
in this case.   In *Cohen v. Trump*, the court's decision did <u>not</u> relate to the

27   applicability of the surveys, but rather to the sufficiency of Dr. McDuff's

28   explanation regarding one aspect of his conclusions.

1    Dr. McDuff makes no such assumption.  Rather, his apportionment is based on the

2    actual economic contribution of the patents-in-suit and the recognition that use

3    while in transit is "the only scenario where [the invention] derives its value."  (*See*

4    McDuff Report, ¶ 86a.)  Carucel did not invent base stations or multiple antenna

5    structures on base stations—Carucel itself has readily admitted as much.[6]  Instead,

6    Carucel invented a base station with multiple antennas that is designed for use at or

7    near the speed of traffic.  Apportioning the royalty base so that it reflects the

8    economic contribution of the patents-in-suit, in order to exclude usage that is

9    unrelated to Caurcel's contribution to the art, is necessary in order to "tie proof of

10   damages to the claimed invention's footprint in the market place."  *ResQNet.com,*

11   *Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

12       In essence, Carucel argues that McDuff should be excluded for apportioning

13   *too much*—that the royalty base *must* be the entire market value of the accused

14   devices because the claims are directed to a device that is "configured to" work in

15   traffic.  (Mot. at 5.)  Courts have specifically rejected Carucel's argument that the

16   royalty base must be the entire value of the accused product where the claims are

17   directed to the entire device.  *See, e.g., GPNE Corp. v. Apple, Inc.*, No. 12-CV-

18   02885-LHK, 2014 WL 1494247, at *12 (N.D. Cal. Apr. 16, 2014).  In *GPNE*, the

19   defendant's damages expert used the value of a specific chip as the royalty base,

20   which the patentee alleged was improper because "the patent claims are directed to

21   the entire [iPhone] device, not just the chip."  *Id.* at *11.  The court rejected this

22   argument, noting that the royalty base was tied to "the patent's contribution to the

---

23

24       [6]  *See* Declaration of Bruce R. Zisser, Ex. 1 (Gavrilovich Dep. Tr.) at 115:4-24
     ("Q. Did your father invent antenna diversity? A. Antenna diversity by itself . . . No.
25   . . . Q. And do you believe he invented antenna diversity on a base station? . . . A.
     Are you asking if on a base – you know, antenna diversity on a base station may
26   have been in a prior art."); *id.,* Ex. 2 (Kennedy Dep. Tr.) at 41:23-42:1 ("Q. Do you
     know if the inventor invented antenna diversity? A. . . . . [I]t's my nontechnical
27   understanding that he did not.").

28

art."  The court further reasoned that to hold otherwise would "allow patent drafters
to effectively abolish the [EMVR]" by "drafting patent claims to cover end
products" and "recite generic . . . limitations."  *Id.* at *12-13; *see also Emerson Elec.
Co. v. Suzhou Cleva Elec. Appliance Co.*, No. 4:13CV1043SPM, 2015 WL
8916113, *3-6 (E.D. Mo. Dec. 15, 2015) (excluding patentee's expert who based
royalty on value of the overall vacuum instead of the novel caster feature, and
rejecting patentee's argument that no apportionment was needed because the claims
literally covered the entire vacuum).

Furthermore, Carucel fails to cite a single decision where the defendant's
damages expert was excluded for apportioning "too much."  Carucel may believe
that Dr. McDuff understated the value of its invention by apportioning the royalty
base according to the percentage of use while moving, but that is a factual dispute it
may address through cross-examination.  *See, e.g., Finjan, Inc. v. Blue Coat Sys.,
Inc.,* No. 13-CV-03999-BLF, 2015 WL 4272870, at *6 (N.D. Cal. July 14, 2015)
(rejecting motion to exclude expert who had apportioned based on use of the
patented feature, holding that "Plaintiff's assertions that the analysis does not
include all patents or claim elements that it asserts are infringed . . . are more
appropriately subjects for cross-examination").

Finally, Carucel's contention that Dr. McDuff erred in apportioning the
"royalty *base*" instead of the "royalty *rate*" clearly has it backwards.  The whole
purpose of apportionment is to "produce a royalty ***base*** . . . closely tied to the
claimed invention," *VirnetX*, 767 F.3d at 1327 (Fed. Cir. 2014) (emphasis added),
and for years the Federal Circuit took the position that apportioning the royalty rate
was insufficient under the entire market value rule.  *Uniloc USA, Inc. v. Microsoft
Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("The Supreme Court and this court's
precedents do not allow consideration of the entire market value of accused products
for minor patent improvements simply by asserting a low enough royalty rate."); *see
also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir.

Case No. 13:16-CV-00118-H-KSC

DEFENDANTS' OPPOSITION TO CARUCEL'S *DAUBERT* MOTION REGARDING DR. DEFOREST MCDUFF

1    2012).  The Federal Circuit only recently indicated that applying a low-enough

2    royalty may, in some cases, satisfy the apportionment requirement—but it did

3    nothing to suggest that such an approach was required.  *Ericsson*, 773 F.3d at 1226.

4            2.      <u>Dr. McDuff Does Not "Double Count" Apportionment</u>

5        Carucel's cursory argument that Dr. McDuff "double apportions" is not

6    supported by any authority, or even much explanation.  Dr. McDuff performed his

7    apportionment in two steps—a Relevant Use Apportionment to account for usage

8    that is not related to the economic value of the invention, and a Price-Based

9    Apportionment to account for non-infringing functionality Novatel has added to

10    MiFi products over the years.  Stated differently, a MiFi 6620L device has both (1)

11    limited relevant use and (2) non-infringing functionality that was not present in the

12    original MiFi 2200, and thus both a use-based apportionment and price-based

13    apportionment are appropriate for this product.  *See, e.g., Summit 6*, 802 F.3d at

14    1296 (approving multi-step apportionment, one step based on component cost and

15    another based on user statistics show the frequency of infringing use).

16            3.      <u>Dr. McDuff Is More Than Qualified To Opine On the Value of Carucel's Invention</u>

17

18        Carucel's attack on Dr. McDuff's qualifications to rely on user statistics and

19    government reports is misguided.  Federal Rule of Evidence 702 permits expert

20    testimony so long as the expert "is qualified by knowledge, skill, experience,

21    training, or education" and possesses specialized knowledge that "will help the trier

22    of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

23    Dr. McDuff is an expert on intellectual property damages, having been retained as

24    an expert in more than 80 cases and qualified as such at trial in nearly a dozen cases.

25    While Dr. McDuff does not have "experience in the transportation industry," that is

26    utterly beside the point because he is not opining on "transportation patterns."  (Mot.

27    at 7.)  Instead, Dr. McDuff is valuing the economic contribution of Carucel's

28    claimed invention—something he is undoubtedly qualified to do.

The statistics underlying Dr. McDuff's Relevant Use Apportionment fall squarely within his purview as an economist.  It is well-settled that experts may testify about what documents reveal and whether they are relevant to their ultimate opinions in a case.  *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360 (Fed. Cir. 2012); *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 U.S. Dist. LEXIS 136172, at *7 (N.D. Cal. Nov. 28, 2011) (allowing expert damages testimony where expert relied on technical background documents relevant to damages analysis).  The Federal Circuit has held that "frequency of expected use and predicted value" are relevant to *Georgia–Pacific* factor 11, which concerns "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."  *Lucent,*, 580 F.3d at 1324.  Accordingly, Dr. McDuff analyzed the frequency of MiFi use in transit (the use that is relevant to Carucel's invention) based on the types of evidence—user statistics and reports prepared by the Bureau of Labor Statistics and U.S. Census Bureau—that are regularly used by economists.

4.   Use Statistics Are a Reliable Basis For Estimating Relevant Use

"[S]urvey evidence should ordinarily be found sufficiently reliable under *Daubert,*" because "[u]nlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value."  *Sentius Int'l, LLC v. Microsoft Corp.*, No. 5:13-CV-00825-PSG, 2015 WL 331939, at *2 (N.D. Cal. Jan. 23, 2015) (admitting survey and related testimony despite expressing "significant concerns about both the structure of the survey and the way in which it was conducted," because such criticisms "go to the weight, and not the admissibility, of the survey.").  Dr. McDuff's Relevant Use Apportionment is based on a staggering volume of data—nearly ███ real-life MiFi sessions.  Courts routinely admit survey evidence based on far smaller samples.  *See, e.g., i4i*, 598 F.3d at 855 (district court did not abuse its discretion in admitting expert's testimony on damages based in part on a survey with a sample size of 46 total

respondents).  Even assuming the Verizon data contains flaws—and Carucel has not identified any specific flaw, aside from attorney argument—those concerns are a matter for cross examination, not exclusion.

Dr. McDuff did not, as Carucel asserts, merely adopt Verizon's opinions as his own.  In addition to relying on Dr. Kenney and Verizon engineers for the technical elements related to the collection and interpretation of the data, Dr. McDuff performed his own assessment of the reliability and representativeness of the data based on his experience and knowledge as an economist.  This included an analysis of the appropriate time period (*e.g.*, days of the week, the extent to which the data may be influenced by seasonality) and the selected locations (commuting patterns and the rates of commuting by car or train).  He utilized the data collected by Verizon but performed his own calculation of the confidence intervals associated with the data, which led him to conclude that the sample was more than sufficient to permit "statistically valid conclusions about the percentage of the relevant use case." (McDuff Report at ¶ 45a(i).)  In any event, courts have permitted defense experts to calculate damages based on usage statistics supplied by the accused infringer.  *See, e.g., Finjan*, 2015 WL 4272870 at *6.

Carucel baldly asserts that the dataset is not representative, but it makes no attempt to actually point to specific flaws.  Importantly, Dr. McDuff provided Carucel with the formula needed to calculate confidence intervals, and yet Carucel apparently chose not to do so.  Had Carucel actually performed the calculation, they would have realized what Dr. McDuff already knew based on his expertise—that confidence intervals for a binomial distribution require just a few hundred data points, whereas the user statistics relied on by Dr. McDuff provide *tens of thousands* of data points.  Dr. McDuff's recognition that the percentage of relevant use "[c]ould [] be a couple of percentage points higher or . . . lower" is hardly surprising, since every survey and sampling methodology entails a certain degree of

imprecision.  Carucel fails to explain why or how any imprecisions in the Verizon data are so egregious as to warrant exclusion under *Daubert*.

Carucel's other criticisms of Dr. McDuff's analysis of the data amount to nitpicking, and at best raise issues for cross-examination.  *First*, the fact that data was collected after the damages period is irrelevant because the "book of wisdom" permits experts to rely on data post-dating the hypothetical negotiation, and Carucel has pointed to no good reason to believe that MiFi usage today is different than it was during the damages period.  Finally, as Dr. McDuff explains in his report, his focus on sessions involving four or more towers is necessary to accurately determine use in transit—in densely populated areas, users may connect to three base stations by traveling less than a half-mile.  In any event, Carucel has the raw data, and thus it is perfectly capable of cross-examining Dr. McDuff on how his damages calculations would change if he included sessions involving less than four towers.

### 5. Dr. McDuff's Reliance On Time Use Surveys Is Reasonable and Reliable

As a secondary method of estimating the percentage of MiFi use while in transit, Dr. McDuff relies on studies published by reliable sources that are routinely relied upon by economists—*i.e.*, the Bureau of Labor and Statistics, the U.S. Census Bureau, and the Department of Transportation.  The fact that these documents don't specifically relate to "mobile hotspot usage" has no bearing on whether Dr. McDuff may draw reasonable conclusions from data related to work and travel.  The degree of specificity demanded by Carucel—*e.g.*, that Dr. McDuff must have "data about how many [survey] participants owned or used wireless hotspots," and "how often hotspots were used while engaged in various activities"—has no basis in law.

Carucel's remaining complaints are just a series of conjectures as to why the conclusions Dr. McDuff draws from the data may be inaccurate.  Carucel may be correct that people use hotspots less frequently while at home, but does not explain why this would have a material affect on Dr. McDuff's conclusions regarding time

1    spent traveling for work or recreation.  Similarly, Carucel posits that some people

2    may actually use their MiFi devices while driving, but does not provide any

3    evidence that would suggest that is prevalent enough to render the time use studies

4    "useless."  Finally, the fact that a damages "methodology was not peer-reviewed or

5    published does not necessitate its exclusion."  *Summit 6,* 802 F.3d at 1298.

   6.    Dr. McDuff's Price-Based Apportionment Properly Accounts
         For the Value of Later-Added Non-Infringing Functionality

6
7        Plaintiff's claim that Dr. McDuff "violated" the entire market value rule is

8    based on a clear misunderstanding of the EMVR.  The EMVR prohibits a party—

9    invariably the patentee—from basing the royalty on the entire value of the accused

10   products, except in the rare circumstances that the patented feature creates the basis

11   for demand for the product.  *Uniloc,* 632 F.3d at 1318–21.  Dr. McDuff's royalty is

12   not based on the entire market value of the accused products—Carucel does not

13   claim otherwise.  Thus, his Price-Based Apportionment does not violate the EMVR.

14       Contrary to Plaintiff's contention, the EMVR does not mandate a single

15   "correct methodology," or prevent experts from apportioning based on something

16   other than specific components.  To the contrary, "under th[e] apportionment

17   principle, there may be more than one reliable method for estimating a reasonable

18   royalty," *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,

19   809 F.3d 1295, 1301 (Fed. Cir. 2015) (quotation marks omitted), and courts have

20   approved a wide variety of apportionment methodologies.  *See, e.g., Droplets, Inc.*

21   *v. Overstock.com, Inc.*, No. 2:11-CV-401-JRG-RSP, 2015 WL 11120843, at *2

22   (E.D. Tex. Jan. 7, 2015) (apportionment based on survey regarding relative

23   importance of infringing features of defendants' websites); *Ultimatepointer, LLC v.*

24   *Nintendo Co., Ltd.*, No. C14-0865RSL, 2014 WL 7340545, *7-*8 (W.D. Wash.

25   Dec. 22, 2014) (rejecting challenge to defendant's damages expert on the ground

26   that he did not use the "smallest saleable unit," and permitting the expert to

27   apportion based on "certain commercial, non-technical attributes," including

28

-14-

1   "market share, brand recognition, reputation, retail network, etc."); *PerdiemCo, LLC*

2   *v. Industrack LLC*, No. 2:15-CV-726-JRG-RSP, 2016 WL 6611488, at *2 (E.D.

3   Tex. Nov. 9, 2016) (apportionment based on costs of designing around).  Simply

4   put, there is no support for Carucel's assertion that apportionment must be based on

5   a *technical* opinion related to specific components at the BOM level.

6        Furthermore, the manner in which Dr. McDuff accounts for non-infringing

7   functionality is squarely within his expertise as an economist—by analyzing product

8   prices.  He compares the price of the MiFi 2200—the first product with the

9   allegedly infringing features and the product the parties have agreed to treat as a

10   representative product for purposes of infringement—to the prices of later models in

11   order to determine the value of added functionality.  (McDuff Report, ¶¶ 45e, 71,

12   Attachments C-3, D-1).  Carucel fails to identify a single flaw with this analysis.

13   Instead, it criticizes Dr. McDuff for effectively attributing 100% of the MiFi 2200 to

14   the patented functionality, which is simply not true—McDuff apportions out 92.5%

15   of the value of the MiFi 2200 based on the Relevant Use Apportionment, he simply

16   does not further apply a Price-Based Apportionment to that product.  And while

17   Carucel may be right that pricing differentials may reflect "factors wholly unrelated

18   to the underlying technology," this only underscores the fact that the product value

19   beyond the price differentials must be apportioned out of the royalty base.[7]

20        B.   Dr. McDuff's Analysis of the Gogo Settlement Is Proper

21        Dr. McDuff's analysis of the Gogo settlement does not violate the EMVR.

22   Carucel once again fails to cite any authorities in support of its argument, and

---

24   [7]  Carucel criticizes McDuff for not applying a price-based apportionment to the
25   MiFi 2200.  At the outset, this only works in Carucel's favor.  More importantly, Dr.
     McDuff's primary apportionment is based on relevant use; the price-based
26   apportionment is applied solely to account for the value of features (e.g., improved
27   GUIs, LCD displays, support for multiple client devices) which are clearly beyond
     the scope of Carucel's patents.
28

Defendants have been unable to locate a single case where a defense expert was precluded from opining on a patentee's prior license due to a supposed failure to apportion.  In fact, courts have held that prior licenses involving the patents-in-suit "inherently allocate value" to the patented method and therefore do not implicate the EMVR.  *See, e.g., In re Maxim Integrated Prods., Inc.*, No. 12-945, 2015 WL 5311264, *6-*12 (W.D. Pa. Sept. 11, 2015).  The fact that the Gogo settlement "may not be perfectly analogous . . . generally goes to the weight of the evidence, not its admissibility."  *PerdiemCo*, 2016 WL 6611488 at *2-*4.

Furthermore, there is no inconsistency between Dr. McDuff's treatment of the Gogo settlement and his treatment of the Novatel hypothetical negotiation.  Dr. McDuff does not apply a Relevant Use Apportionment to the Gogo settlement because Gogo's products—unlike Novatel's products—can only be used when moving at high speeds.  Thus, a Relevant Use Apportionment is appropriate with respect to Novatel, but not Gogo.

C.   Dr. McDuff's Analysis of Comparable Novatel Licenses Is Closely Tied to the Facts of the Case

Dr. McDuff took a standard economic approach to the licenses under the *Georgia-Pacific* factors.  He first determined which agreements involved comparable technology, based on technical considerations from Dr. Kenney and his own economic assessments.  (McDuff Report, ¶¶ 55a-55l, 56, 58-60.)  He then evaluated the comparable licenses using a wide variety of *Georgia-Pacific* factors, including (a) technological value based on discussions with Dr. Kenney, (b) the products licensed under the agreements, (c) the similarity in time periods, and (d) the identity of the licensee and licensor and the commercial relationship between them.  Dr. McDuff did not blindly rely on all licenses, only those which he determined were comparable—three of the 12 Novatel "in-licenses" and four of the six Novatel "out" licenses.  He identified a royalty range supported by each group of licenses and selected a specific royalty from each range based on his assessment of

comparability and application of the *Georgia-Pacific* factors.  Carucel advances several criticisms of McDuff's analysis, but none of them have merit.

First, while Carucel is right that Dr. McDuff does not make specific quantitative adjustments to the royalty of any particular agreement, the reason is simple—he determined the agreements were sufficiently comparable that *no adjustments were necessary*.  Carucel may disagree with that conclusion, but that is no basis for exclusion under *Daubert*.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (holding that "the degree of comparability of the . . . . agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion.") (citation omitted).

Second, while Carucel identifies a handful of distinctions between certain licenses and the hypothetical negotiation, it never explains why any of these distinctions are material.  For example, Carucel faults Dr. McDuff for "failing" to account for the fact that the Novatel-MLR license predates the hypothetical negotiation by four years, even though Carucel's own damages expert based his damages calculation on a settlement executed more than four years after the hypothetical negotiation—without making any "adjustments" based on that fact.  *Cf. 2-Way Computing, Inc. v. Sprint Solutions, Inc.*, No. 2:11-cv-12, 2015 WL 2365648, *3-*5 (D. Nev. May 18, 2015) (denying motion to exclude expert testimony on comparable licenses because the movant failed to show reasons why the differences in the license agreements were material to the expert's damages analysis).

Third, Carucel cites no support for its claim that damages experts must identify specific products covered by a comparable license, much less "establish the quantity or value of the products."  (Mot. at 17.)  More importantly, Carucel is simply wrong to assert that Dr. McDuff failed to consider the scope of the products covered by the Novatel licenses.  While Carucel appears to concede that the Novatel "in" licenses presumably include all of the accused products, it inexplicably insists

Dr. McDuff must "provide . . . technical analysis" rather than rely on commonsense inferences and the plain language of the licenses.  Similarly, with respect to Novatel's "out" licenses, the licensees are manufacturers of *competing mobile hotspot devices*—Franklin Wireless, ZTE, Sharp, etc.  Dr. McDuff was entitled to rely on the assumption that the licenses include *at least* mobile hotspots—and in the one instance where he identified a license that is significantly broader than the hypothetical license in this case (the Nova-ZTE license, which covers smartphones and tablets in addition to hotspots), he specifically accounted for that difference.

Finally, Carucel's complaint that Dr. McDuff "arbitrarily" chose the median or average of each group of Novatel licenses (Mot. at 17-18) borders on the absurd. The standard approach for selecting a data point from a range of values is to use the median or average.  There is no data point that would be any *less* "arbitrary."

## V.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that Carucel's motion be denied in its entirety.

Dated:  March 20, 2017          QUINN EMANUEL URQUHART
                                & SULLIVAN, LLP


                           By:  /s/ *Amar L. Thakur*
                                Amar L. Thakur
                                Email: amarthakur@quinnemanuel.com

                                *Attorneys for Defendants Novatel Wireless,*
                                *Inc., Verizon Communications, Inc. and*
                                *Cellco Partnership d/b/a Verizon Wireless*