RuyakCherian LLP
1936 University Avenue, Suite 350
Berkeley, CA 94704

1  MICHAEL K. LINDSEY (Admitted *Pro Hac Vice*)
   lindsey@gdllawfirm.com
2  JAMES M. SARNECKY (SBN 202465)
   sarnecky@gdllawfirm.com
3  GAVRILOVICH, DODD & LINDSEY, LLP
   4660 La Jolla Village Dr., Ste. 750
4  San Diego, CA 92122
   Telephone: (858) 458-3607
5  Facsimile: (858) 458-9986

6  ROBERT F. RUYAK  (Admitted *Pro Hac Vice*)
   robertr@ruyakcherian.com
7  BRITTANY V. RUYAK  (Admitted *Pro Hac Vice*)
   brittanyr@ruyakcherian
8  RONALD R. WIELKOPOLSKI  (Admitted *Pro Hac Vice*)
   ronw@ruyakcherian
9  RUYAKCHERIAN, LLP
   1776 Eye St. NW, Suite 750
10 Washington, DC 20006
   Telephone: (202) 838-1560
11
   KORULA T. CHERIAN (SBN 133697)
12 sunnyc@ruyakcherian.com
   ROBERT M. HARKINS, JR. (SBN 179525)
13 bobh@ruyakcherian.com
   RUYAKCHERIAN, LLP
14 1936 University Ave, Suite 350
   Berkeley, CA  94704
15 Telephone: (510) 944-0190

16 Attorneys for Plaintiff
   CARUCEL INVESTMENTS, L.P.
17

18              **UNITED STATES DISTRICT COURT**

19              **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 20  CARUCEL INVESTMENTS, L.P., a Delaware limited partnership, | Case No.  16-cv-0118-H-KSC |
| 21                Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE SUPPLEMENTAL DAMAGES REPORT OF PLAINTIFF'S DAMAGES EXPERT PATRICK F. KENNEDY** |
| 22        v. | |
| 23  NOVATEL WIRELESS, INC., a Delaware corporation; VERIZON COMMUNICATIONS INC., a Delaware corporation; and CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | |
| 24 | |
| 25 | Hearing Date: April 3, 2017 |
| 26 | Time: 9:00 A.M. |
| 27 | Courtroom: 15A |
| 28                Defendants. | Judge: Hon. Marilyn L. Huff |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. DR. KENNEDY'S ANALYSIS OF VERIZON'S DAMAGES UNDER A HYPOTHETICAL NEGOTIATION BETWEEN CARUCEL AND VERIZON WAS APPROPRIATE UNDER DAUBERT ........................................................................................................ 2

III. DR. KENNEDY'S USE OF THE BROADCOM-VERIZON LICENSE AGREEMENT WAS APPROPRIATE UNDER DAUBERT ........................................................................................................ 4

IV. DR. KENNEDY'S ANALYSIS REGARDING THE PROFITABILITY OF THE ACCUSED PRODUCTS TO VERIZON IS APPROPRIATE UNDER DAUBERT ................................. 7

V. DR. KENNEDY'S ANALYSIS REGARDING THE SPH-NOVATEL AGREEMENT IS APPROPRIATE UNDER DAUBERT ...................................................................................................... 11

VI. DEFENDANTS' REQUEST THAT VERIZON BE SEVERED AND STAYED FROM THIS CASE IS IMPROPER, UNTIMELY AND UNWARRANTED ............................................................................... 11

VII. CONCLUSION .................................................................................................. 11

RuyakCherian LLP
1936 University Avenue, Suite 350
Berkeley, CA 94704

# TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) .................................................................................. 5

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014) .................. 5, 7

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1362 (Fed. Cir. 2006) ........................................................................................... 2, 3

*Ericsson Inc. v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ..................... 7

*Foster v. Am. Mach. & Foundry Co.*, 492 F. 2d 1317, 1320-1321 (2nd Cir. 1974) .............................................................................................. 3

*Glenayre Elecs. Inc. v. Jackson*, 443 F.3d 851, 856 (Fed. Cir. 2006) .................... 3

*In re Maxim Integrated Prods.*, 2015 U.S. Dist. LEXIS 124062, *31-33, 2015 WL 5311264 (W.D. Pa. Sept. 11, 2015) ............................................ 7

*Integra v. Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003) ................................................................................................ 4, 5

*Itex Inc. v. Westex Inc.*, 2011 U.S. Dist. LEXIS 23850 *14-15 ........................... 3

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ......... 4

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1110 (Fed. Cir. 1996) ........................... 5

*Multimedia Patent Trust v. Apple Inc.*, 2012 U.S. Dist. LEXIS 165928, *26-31 (S.D. Cal. Nov. 20, 2012) ................................................................ 6

*ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 868 (Fed. Cir. 2010) ............. 3, 7

*Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir. 1983) ........................... 3

*Telemac Corp. v. US Intelicom Inc.*, 185 F. Supp. 2d 1084, 1102 (N.D. Cal. 2001) .............................................................................................. 9

**Statutes**

35 U.S.C. §284 .................................................................................................... 3

RuyakCherian LLP
1936 University Avenue, Suite 350
Berkeley, CA 94704

## I. INTRODUCTION

The Court set a schedule for motions to exclude expert testimony, and Defendants already filed such a motion regarding the supplemental report of Carucel damages expert Patrick Kennedy (Dkt. 169). The Court denied that motion on March 6, 2017 ("Order") (Dkt. 230). This motion represents an impermissible second bite at the apple, and the Court should not consider it.

Were the Court to consider the motion, it should be denied for the same reasons as the earlier motion to strike the same report, and Carucel hereby incorporates the law and discussion of its opposition to that motion (Dkt. 215) as well as the other *Daubert* motion filed by Defendants against Dr. Kennedy's first report. Furthermore, were the Court to allow the additional motion, it should deny it for lack of merit.

First, Defendants reargue that Dr. Kennedy cannot use a hypothetical negotiation between Carucel and Verizon because Verizon would not negotiate. The Court already considered and rejected this argument. (Order, at 4 n.3.) Defendants expand their argument by asserting that any indemnified company would not be party to a hypothetical negotiation, but (1) the law cited by Carucel in its prior opposition and by the Court in its Order leads to a contrary conclusion, and (2) the out-of-date law cited by Defendants relates to an entirely different context and does not support their position under the facts here. This second attempt to argue that Verizon simply would not negotiate remains legally untenable and should be rejected again.

Second, Defendants take issue with Dr. Kennedy's use of a license agreement entered into between Verizon and Broadcom Corporation. However, Dr. Kennedy relied upon Carucel's technical expert to establish comparability. He also properly assessed that the Broadcom license is comparable in its application of a per unit royalty. He appropriately assessed the differences in the setting of that license and the instant case. He followed well-established methods

for evaluating a prior license within the framework of the *Georgia-Pacific* factors. Defendants' complaints at best go to the weight of the opinion, which can be explored on cross examination before the jury, and not to admissibility.

Third, Defendants assert that Dr. Kennedy's analysis of Verizon's profits are unreliable based upon Defendants' repeated erroneous assertion that Verizon sells the MiFi devices at a loss. But Verizon doesn't sell the products for a loss; it makes money two ways on MiFis: (1) the equipment revenue and (2) data service revenue. According to Verizon's own Rule 30(b)(6) witness Thomas Benz, ████████████████████████████████████████████████ ████████████████████████████████████████. The full "sales" price can only be obtained by looking at both types of revenue together. Mr. Benz also testified that ████████████████████████████████████████████████ ██████████████. This data was proper for Dr. Kennedy to use in his analysis.

None of these challenges shows any violation of *Daubert*. Dr. Kennedy's testimony will be helpful to the jury and is based on proper methodology. Defendants' motion to exclude parts of that testimony should be denied.

## II. DR. KENNEDY'S ANALYSIS OF VERIZON'S DAMAGES UNDER A HYPOTHETICAL NEGOTIATION BETWEEN CARUCEL AND VERIZON WAS APPROPRIATE UNDER *DAUBERT*

The Court already denied Defendants' motion to exclude Dr. Kennedy's supplemental damages report on the legally untenable basis that Verizon would not participate in a hypothetical negotiation with Carucel or would be prejudiced by an analysis that it would: "The Court does not find persuasive Defendants' argument that it is prejudicial for them to have to proceed to trial facing two different hypothetical negotiations. (Doc. No. 187 at 11.) *Cf. Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1362 (Fed. Cir. 2006) ('[A] separate infringement beginning at a different time requires a separate evaluation of reasonable royalty damages.')." Order at 4, fn. 3. Damages must be assessed against "the infringer" (here Verizon) and not some other party. *See* 35 U.S.C.

RuyakCherian LLP
1936 University Avenue, Suite 350
Berkeley, CA 94704

§284.  A hypothetical negotiation analysis depends on the specific parties and acts of infringement involved in the negotiation.  *See ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 868 (Fed. Cir. 2010) ("A 'reasonable royalty' derives from a hypothetical negotiation between *the patentee* and *the infringer* when the infringement began.") (emphasis added).  Different acts of infringement can necessitate different hypothetical negotiations even if the same parties are involved. *Applied Med*, 435 F.3d 1356, 1361-1362.

Defendants cite old, inapplicable cases in an attempt to conceal the scope of Verizon's liability from the jury.[1]  Under the "full compensation rule," Carucel is entitled to damages resulting from Novatel *and* Verizon's acts of infringement, not just one of them.  *Glenayre Elecs. Inc. v. Jackson*, 443 F.3d 851, 856 (Fed. Cir. 2006) (Having "introduced and relied on evidence regarding benefits Glenayre's customers would experience by using infringing products purchased from the Glenayre….[this court concludes that plaintiff] has fully litigated his full measure of damages such that the remitted damages award that [plaintiff]

---

[1] Defendants mischaracterize three old cases as allegedly supporting their position, but they do not.  Those cases address a different issue entirely, which is the problem of a patentee attempting to obtain damages not for an infringing product, but items made using infringing products.  That has nothing to do with this case, where Dr. Kennedy's opinion only relates to revenues generated directly from the infringing products themselves.  In *Foster*, the Second Circuit rejected a hypothetical negotiation analysis between the patentee and mill operators for tube and pipe that was made using an infringing welding product, rather than damages from the infringing welding product itself.  *Foster v. Am. Mach. & Foundry Co.*, 492 F. 2d 1317, 1320-1321 (2nd Cir. 1974).  In *Stickle*, the Federal Circuit concluded that the trial court erred in basing a royalty on the "production" of a taco shell production facility using the patented taco shell fryer, rather than a lump-sum royalty for each infringing machine.  *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir. 1983).  And, in *Itex*, the court denied expensive and burdensome discovery of infringing fabric customers where the parties had already agreed that the patentees were "not entitled to recover against the manufacturers for their sale of a ream of [infringing] fabric to the customers, and then again for the customers' sale of garments incorporating that same fabric." *Itex Inc. v. Westex Inc.*, 2011 U.S. Dist. LEXIS 23850 *14-15.  The cases do not stand for Defendant's proposition, and have nothing to do with this case.

RuyakCherian LLP
1936 University Avenue, Suite 350
Berkeley, CA 94704

collected constitutes *full compensation* as a matter of law for (1) direct infringe of the '900 patent by Glenayre due to its manufacture and sale of infringing products; (2) direct infringement of the '900 patent by Glenayre's customers due to their use of products purchased from Glenayre….") (emphasis added).

Defendants cite no case law in support of their spurious proposition that Verizon should be excluded from a hypothetical negotiation analysis on the premise that later it would be indemnified by Novatel, and the argument is legally incorrect. The hypothetical negotiation assumes the patent is valid and infringed, which it would not be if Verizon were covered by a Novatel license. Also, whether Verizon's infringement would subsequently be covered by an indemnification agreement is legally immaterial, because the hypothetical negotiation cannot allow a party to infringe and then seek reimbursement. *See Integra v. Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003), *vacated on other grounds by* 545 U.S. 193 (2005) ("Thus, the reasonable royalty calculus assesses the relevant market as it would have developed *before* and *absent* the infringing activity.") (emphasis added); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (negotiation between parties must be "before infringement began").

Having made no credible arguments regarding the alleged unreliability of the Supplemental Report, the Motion should be denied.

### III. DR. KENNEDY'S USE OF THE BROADCOM-VERIZON LICENSE AGREEMENT WAS APPROPRIATE UNDER *DAUBERT*

Dr. Kennedy properly relied on a prior license agreement between Verizon and Broadcom (the "Broadcom license"). He spent a considerable amount of time conferring with Dr. Kiasaleh to be satisfied that this license was technologically comparable, even though the Broadcom patents were less valuable than the Patents-in-Suit due to the availability of design arounds. (Kennedy Supp. Rpt., at 24-26, 50, 52, 56-58 [Dkt. 169-1 Ex. F].) He also performed an extensive analysis of economic comparability. (*Id.*, at 22-26, 42-45,

47, 53, 56-60.)  He then took into account differences existing between the Broadcom license and the hypothetically negotiated license between Verizon and Carucel.  (*Id.*)  This is exactly the methodology courts have held repeatedly should be used in analyzing comparable licenses as part of the *Georgia-Pacific* analysis. "As we have held many times, using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc*., 694 F.3d 1312, 1333 (Fed. Cir. 2012); *Maxwell v. J. Baker, Inc*., 86 F.3d 1098, 1110 (Fed. Cir. 1996).

As with Defendants' opposition to the use of the SPH License, Defendants do not seriously contend that Dr. Kennedy could not have relied on the Broadcom license, or that the method he followed was in some way unsound. Instead, Defendants argue that they believe the Broadcom license is not sufficiently comparable due to differences in the parties and risks.  Defendants cite no case law to support their position that licenses can be excluded for consideration in a hypothetical negotiation analysis based upon differences in the economic characteristics of the parties.[2]  Similarly, Defendants offer no case law to support their position that a license cannot be adjusted to account for differences in negotiating parties' risk in the hypothetical negotiation.[3]  As discussed above, Dr. Kennedy provided a detailed analysis comparing the products and economic circumstances of the parties to the Broadcom license and

---

[2] Contrary to Defendants' characterization, *Sentius* does not hold that a comparable license should be excluded from consideration based upon the economic characteristics of the parties to the license.  Instead, in that case the court excluded a license from consideration due to the failure of the expert to adequately account for differences between the excluded license and the hypothetical negotiation (the specific differences were redacted from the decision). *Sentius Int'l, LLC v. Microsoft Corp.,* 2015 U.S. Dist. LEXIS 10423, *26-28 (N.D. Cal. Jan. 27, 2015). Here, Dr. Kennedy did account for differences.

[3] Defendants' citation to *Integra Lifesciences I, Ltd. v. Merck KGaA*, is highly misleading in this regard, as the "level of risk" was not litigation risk but was risk associated with different stages of clinical trials in drug research.  331 F.3d 860, 870-871 (Fed. Cir. 2003).

the hypothetical negotiation.

Defendants make other criticisms regarding Dr. Kennedy's use of the Broadcom license that fall squarely under cross-examination and are not grounds for exclusion.  Each criticism also is based on incorrect characterizations of the facts and Dr. Kennedy's report.  For example, Defendants state that Dr. Kennedy "brushed aside" the exclusion order related to the Broadcom patents.  In reality, Dr. Kennedy fully considered the facts surrounding the exclusion order and incorporated them into his analysis.  He conferred with Dr.Kiasaleh regarding the availability of design-arounds and then confirmed the availability of actual design-arounds using Qualcomm's SEC filings and press releases.  (Kennedy Supp. Rpt. 24-25 [Dkt. 160-1 Ex. F].)  Defendants mischaracterize the actual terms of the exclusion order.  The ITC order only applied to new, not existing, products, contrary to Defendants' representations (representations that appear to rely on "contemporaneous media reports" instead of the actual documents). Defendants also criticize Dr. Kennedy's application of the $6 per unit royalty based on arguments about the number of units Verizon sold after the $200 million royalty cap. However, Defendants' motion fails to consider that the royalty would only be paid up until the time that the Qualcomm settlement agreement with Broadcom was reached.  Such an agreement in fact was reached during the term of the agreement.  (*Id.,* at 24.)  In any event, these items can be explored in cross examination.

Defendants point to no law or testimony that Dr. Kennedy's adjustments were improper.  Such challenges should not form the basis of *Daubert* challenges, but rather be part of cross-examination at trial.  This Court has rejected similar challenges before.  *See Multimedia Patent Trust v. Apple Inc.*, 2012 U.S. Dist. LEXIS 165928, *26-31 (S.D. Cal. Nov. 20, 2012) (Huff, J.) (holding comparable license expert testimony admissible when the expert provided a basis for comparison and accounted for differences, noting that

criticisms should be handled in cross examination). "Once the expert shows some discernible link between the comparable license and the claimed technology, distinctions and oversights are matters for cross-examination." *In re Maxim Integrated Prods.*, 2015 U.S. Dist. LEXIS 124062, *31-33, 2015 WL 5311264 (W.D. Pa. Sept. 11, 2015) (internal citations omitted); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014) (a jury is capable of assigning the appropriate weight to comparable licenses); *Ericsson Inc. v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility").  Not only is it appropriate to make adjustments to other licenses that are comparable but will also embody certain differences, it is required for an expert to do his or her job correctly.  If Defendants disagree with the adjustments, they can raise their issues with the jury.  Such challenges, at best, go to the weight and not the admissibility of the expert's opinions. *See Apple,* at 1326.

## IV. DR. KENNEDY'S ANALYSIS REGARDING THE PROFITABILITY OF THE ACCUSED PRODUCTS TO VERIZON IS APPROPRIATE UNDER DAUBERT

Defendants continue to claim that Verizon made no profit on the accused devices, because it allegedly sold the MiFi devices at a loss.  This is a fiction, intended to disguise Verizon's commercialization of the accused devices by pretending that the bundled data service plans are an unrelated transaction. Refuting Defendants' argument, Verizon's Director of Business Intelligence Mr. Thomas Benz repeatedly testified during his deposition that





Benz Dep. Trans. At 160:17-25, 162:17-25, 99:5-24 (Declaration of Robert Harkins in Support of Plaintiff's Opp'n. to Defendants' Motion to Exclude the Supplemental Damages Report of Plaintiff's Damages Expert Patrick F. Kennedy ["Harkins Dec."], Harkins Decl., Ex. 1) (italic emphasis added); *see also id.* at 38:17-22 ("Q. Just to be clear, the reason that Verizon offers a substantial discount on the device is because ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬."); 37:5-10 ("Q. Why does Verizon offer a discount -- in this case, 75 percent -- for purchasing the device with a two-year contract?  A. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬").

Consistent with Mr. Benz's testimony, Dr. Kennedy evaluated the profitability of the accused products in light of the bundled data service plans. (Kennedy Supp. Rpt., at 10-21 [Dkt. 169-1 Ex. F].) Dr. Kennedy's assumptions are not based on novel theories that he created for this litigation; they are based instead on Mr. Benz's testimony, Verizon's statements to the Federal Communications Commission ("FCC") and Verizon's Securities Exchange Commission ("SEC") filings.[4] Based on Verizon's own representations and using its own terms, Verizon subsidizes the standalone price (a term used by Verizon throughout its SEC filings) with service plan revenues. (Kennedy Supp. Rpt., at 10-18). Verizon cannot escape its disclosures to the SEC and the FCC. Dr. Kennedy's analysis correctly incorporates the actual facts and circumstances of Verizon's subsidy model into his analysis and correctly attributes the actual value of the Mifi device as the standalone price of the device without a contract.[5]

Defendants also misrepresent Dr. Kennedy's analysis as treating the data service plans as convoyed sales and then misstate the law on convoyed sales.[6]

---

[4] Dr. Kennedy properly relied on evidence from Verizon itself that retail MiFi prices were not inflated, noting that in 2009 in response to an FCC inquiry, Verizon represented that the retail price was proper but that bundling with data allowed for substantial discounts: "This pricing structure enables Verizon Wireless to offer wireless devices at a substantial discount from their full retail price." Kennedy Supp. Rpt., at 16. In contrast, Defendants have provided no evidence that Verizon "inflated the no-contract price." Supp. Daubert Motion at 19 [Dkt. 169]. If Verizon's attorneys want to argue that Verizon lied to the FCC and that Dr. Kennedy should not believe what Verizon told a government agency that is a topic they can raise in cross examination.

[5] Defendants mischaracterize Dr. Kennedy's report in their discussion of Verizon's pricing in a number of aspects. First, they falsely attribute quotes to Dr. Kennedy when they are in fact quotes from Verizon's own expert in its FCC proceedings. (Kennedy Supp. Rpt., at 16-18). They also falsely attribute an opinion to Dr. Kennedy that Verizon is "biased towards bundled sales," whereas Dr. Kennedy only stated (correctly) that more consumers purchased devices with a contract than without.

[6] For example, courts have found damages based upon a combination of telecommunications hardware and associated service plans. *See, e.g., Telemac Corp. v. US Intelicom Inc.*, 185 F. Supp. 2d 1084, 1102 (N.D. Cal. 2001) ("Based on this review and consideration of all evidence presented at trial, Telemac is entitled to a three dollars per-unit royalty on all USI handsets sold or manufactured in the United States and a ten percent royalty rate applied to the value of all airtime downloaded into infringing handsets during the infringing period.")

Dr. Kennedy only included Verizon's revenue measured by the stand-alone equipment price to analyze Verizon's true profitability from device sales. (Kennedy Supp. Rpt., at 21). He did not assume service plan revenues were convoyed sales and he does not include service plan revenues in the royalty base.

"A 'convoyed sale' refers to the relationship between the sale of a patented product and a functionally associated non-patented product." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008).[7] Here, the data service plans are not "non-patented"; they are specifically for use of the infringing devices, which itself is infringement, so the law of convoyed sales is not preclusive. A convoyed sale would include, for example, data services for other non-infringing devices that Verizon only received because customers were buying infringing MiFi data plans. But Carucel is not seeking those revenues, it only seeks a royalty on data service revenue directly attributable to the MiFi devices, which is the revenue Verizon supplied. (*See, e.g,* Benz Depo., 140:18-142:14; 19:11-25:19.) Also, were MiFi data plans characterized as convoyed sales, Defendants still would fail to make the case that MiFis are not functionally associated with the data service plans—on the contrary, the data service revenue stems exclusively from the MiFi devices, and the MiFi devices cannot work without associated data plans. Verizon associates both types of revenue as MiFi

---

[7] Defendants significantly overstate the holding in *Am. Seating Co.* The Federal Circuit did not issue a blanket proclamation against assessment of damages from different types of revenue (and it would not, because such proclamation would violate the full compensation rule). Instead, it merely affirmed the denial of collateral sales under the facts of that case because no functional relationship existed between the two types of revenue in that case (seats and restraint systems). "Because it is clear that no interrelated or functional relationship inheres between the [non-infringing] seats and the [infringing] tie-down restraint system on a passenger bus, the district court was correct that the jury had no basis to conclude that lost profits on collateral sales of [non-infringing] passenger seats were due American Seating." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1269 (Fed. Cir. 2008). In contrast, here Verizon's corporate representative admitted that equipment fees and data service fees were completely intertwined and functionally related.

revenue. (Benz Depo., at 29:1-30:2.) The motion should be denied.

## V. DR. KENNEDY'S ANALYSIS REGARDING THE SPH-NOVATEL AGREEMENT IS APPROPRIATE UNDER DAUBERT

Defendants also incorporate a challenge to use of the SPH-Novatel Agreement. It is the same issue from Defendants' first *Daubert*; rather than repeat, Plaintiff incorporates its opposition to that motion by reference here.

## VI. DEFENDANTS' REQUEST THAT VERIZON BE SEVERED AND STAYED FROM THIS CASE IS IMPROPER, UNTIMELY AND UNWARRANTED

Defendants also assert that Verizon should be severed and stayed from this case, but that has nothing to do with *Daubert*; there is no motion pending on this issue. Also, the Court already rejected Verizon's earlier motion to sever and stay, noting that "in the event that a second round of proceedings is required, Carucel would be prejudiced by such duplicative proceedings." Dkt. 109, at 6. The Court found that Verizon would not be prejudiced by having the proceedings in one trial, and that it was appropriate to do so when the trial related to one set of products with the defendants simply operating at different levels in the same stream of commerce. *Id.,* at 7-9. As the Court noted then, and is truer now on the eve of trial, "Severing [Verizon] from this action would not promote judicial economy and would unnecessarily complicate the proceedings." *Id.,* at 9.

## VII. CONCLUSION

Dr. Kennedy is an economist who has performed a valuable service to courts in hundreds of lawsuits to objectively assess damages based on well-established economic principles, and Defendants have not shown otherwise. There is no reason to exclude any of Dr. Kennedy's testimony.

Dated: March 20, 2017

*/s/ Robert Harkins*
Robert Harkins, Cal. Bar No. 179525
RuyakCherian LLP
1936 University Ave, Ste 350
Berkeley, CA  94704
Telephone: (510) 944-0190
bobh@ruyakcherian.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 27th day of January, 2017, with a copy of this document via the Court's EM/ECF system. Any other counsel of record will be served by electronic mail, facsimile and/or first class mail on the same date.

*/s/ Robert Harkins*
Robert Harkins

RuyakCherian LLP
1936 University Ave, Ste 350
Berkeley, CA  94704
Telephone: (510) 944-0190
sunnyc@ruyakcherian.com