1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

CARUCEL INVESTMENTS, L.P., a
Delaware limited partnership,

                                   Plaintiff,

v.

NOVATEL WIRELESS, INC., a
Delaware corporation; VERIZON
COMMUNICATIONS, INC., a Delaware
corporation; and CELLCO
PARTNERSHIP d/b/a/VERIZON
WIRELESS, a Delaware general
partnership,

                                   Defendants.

Case No.:  16-cv-118-H-KSC

**ORDER:**

**(1) GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
<u>DAUBERT</u> MOTIONS;**

**[Doc. Nos. 163, 210.]**

**(2) DENYING WITHOUT
PREJUDICE DEFENDANTS'
<u>DAUBERT</u> MOTIONS;**

**[Doc. Nos. 154, 207.]**

**(3) DENYING WITHOUT
PREJUDICE PLAINTIFF'S
MOTIONS IN LIMINE; AND**

**[Doc. Nos. 232, 233, 234, 235.]**

1

**(4) GRANTING IN PART AND DENYING PART DEFENDANTS' MOTIONS IN LIMINE**

**[Doc. Nos. 238, 239, 240, 241, 242, 287.]**

On January 27 and February 24, 2017, the parties each filed <u>Daubert</u> motion to exclude portions of the testimony and opinions of the opposing party's damages expert. (Doc. Nos. 154, 163, 207, 210.)  On March 20, 2017, the parties filed their respective oppositions to the <u>Daubert</u> motions.  (Doc. Nos. 248, 249, 256, 257.)  On March 27, 2017, the parties filed their respective replies.  (Doc. Nos. 267, 274, 279, 280.)

On March 13, 2017, the parties each filed their respective motions in limine.  (Doc. Nos. 232, 233, 234, 235, 238, 239, 240, 241, 242.)  On March 20, 2017, the parties filed their respective oppositions to the motions in limine.  (Doc. Nos. 252, 253, 254, 255, 258, 259, 260, 261, 262.)  On March 27, 2017, the parties filed their respective replies.  (Doc. Nos. 268, 269, 270, 271, 272, 281, 282, 283, 284.)

The Court held a hearing on the matter on April 3, 2017.  Robert F. Ruyak, Robert M. Harkins, Jr., and Michael K. Lindsey appeared for Plaintiff.  Amardeep L. Thakur, David M. Grable, Joshua L. Sohn, and Viola Trebicka appeared for Defendants.  For the reasons below, the Court: (1) grants in part and denies in part without prejudice Plaintiff's <u>Daubert</u> motions; (2) denies without prejudice Defendants' <u>Daubert</u> motions; (3) denies without prejudice Plaintiff's motions in limine; and grants in part and denies in part without prejudice Defendants' motions in limine.

## <u>Background</u>

On May 27, 2015, Plaintiff Carucel Investments, L.P. filed a complaint for patent infringement in the United States District Court for the Southern District of Florida against Defendants Novatel Wireless, Inc., AT&T Mobility LLC, Verizon Communications, Inc.,

2

and TigerDirect, Inc., alleging infringement of U.S. Patent No. 7,221,904, U.S. Patent No. 7,848,701, U.S. Patent No. 7,979,023, U.S. Patent No. 8,463,177, U.S. Patent No. 8,718,543, and U.S. Patent No. 8,849,191.[1]  (Doc. No. 1, Compl.)  Specifically, Plaintiff alleges that Defendants' mobile broadband hotspot devices, their MiFi devices, infringe the patents-in-suit.  (Id. ¶¶ 28-29.)

On September 15, 2015, Carucel dismissed its claims against Defendant TigerDirect, Inc. with prejudice.  (Doc. No. 11.)  On December 16, 2015, Carucel filed a first amended complaint alleging infringement of the same six patents and adding as a new Defendant Cellco Partnership d/b/a Verizon Wireless.  (Doc. No. 58.)

On January 15, 2016, the action was transferred to the Southern District of California.  (Doc. Nos. 69-70.)  On September 19, 2016, the Court issued a claim construction order construing the disputed terms in the patents-in-suit.  (Doc. No. 131.)  On December 9, 2016, the Court dismissed Defendant AT&T with prejudice.  (Doc. No. 139.)  On March 2, 2017, the Court denied Defendants' motion for summary judgment.  (Doc. No. 226.)

The patents-in-suit are all entitled "Mobile Communication System with Moving Base Station" and share an essentially identical specification.  (See Doc. No. 1, Compl. Exs. A-C, E-F.)  The invention disclosed in the patents-in-suit "relates to cellular telephone systems in which a mobile unit communicates by wireless communication to a base station connection to the wire telephone network and more particularly to cellular telephone systems adapted for use with fast-moving mobile units."  '904 Patent at 1:16-19.  The specification details the problems that prior art telecommunications systems have with fast-moving mobile units, particularly the problem of dealing with transfers of fast-moving mobile units between stationary cell sites as the mobile units move through the cellular network.  See id. at 1:22-2:61.  The specification provides the following summary of the

---

[1]      The '177 and '191 patents are no longer asserted in this action.  (Doc. No. 198; Doc. No. 277 at 3, 5.)

16-cv-118-H-KSC

invention:

> These and other problems of the prior art are overcome in accordance with this invention by means of a moving base station which is interposed between a moving mobile telephone unit and a fixed base station. In accordance with this invention, a movable base station moves with the traffic at a rate of speed which is comparable to the speed of the traffic and communicates with a moving mobile telephone unit via standard mobile radio transmission. The movable base station further communicates by radio signals with a plurality of fixed antennas spaced along the path of travel of the mobile base station. The several fixed antennas are connected to a telephone wire line network via a telephone gateway office in a standard fashion. In accordance with this invention, the fixed radio ports are synchronized and the interface between the moving base station and the fixed radio ports is a time division multiplexed (TDM)-direct-sequence, spread-spectrum CDMA.

Id. at 3:18-34. Figure 1 of the '904 patent displays an embodiment of the claimed system:



16-cv-118-H-KSC

As an example of the claimed invention, Claim 22 of the '904 Patent provides:

> An apparatus adapted to move in accordance with a movement of a mobile unit moving relative to a plurality of fixed radio ports, the apparatus comprising:
>
> a receiver adapted to receive a plurality of signals, each of the plurality of signals transmitted from each of the plurality of fixed radio ports within a frequency band having a lower limit greater than 300 megahertz;
>
> a transmitter adapted to transmit, within the frequency band, a resultant signal to the mobile unit in accordance with at least one of the plurality of signals; and
>
> a processor adapted to maximize an amount of transferred information to the mobile unit by evaluating a quality of each of the plurality of signals transmitted from the plurality of fixed radio ports.

Id. at 12:65-13:11.  Currently, Plaintiff asserts that Defendants' accused products (the MiFi 5510L, MiFi 6620, MiFi 4510L, MiFi 4620, and MiFi 2200) literally infringe claims 22 and 30 of the '904 patent; claims 10 and 15 of the '701 patent; claims 11 and 23 of the '023 patent; and claim 10 of the '543 patent.  (Doc. No. 198; Doc. No. 277 at 5-6.)  By the present motions, the parties move to exclude certain opinions, arguments, testimony and evidence from the trial.

## Discussion

### I.      **Daubert** Motions

#### A.      Legal Standards for Daubert Motions

A district court's decision to admit expert testimony under Daubert in a patent case is governed by the law of the regional circuit.  Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1294 (Fed. Cir. 2015).  When considering expert testimony offered pursuant to Rule 702, the trial court acts as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable."  Elsayed Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002); see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Daubert, 509 U.S. at 597.  Under Rule 702 of the Federal Rules of Evidence,

5

a court may permit opinion testimony from an expert only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The test for reliability of expert testimony is flexible and depends on the particular circumstances of the case. Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969 (9th Cir. 2013). "To aid courts in exercising [their] gatekeeping role, the Supreme Court has suggested a non-exclusive and flexible list of factors that a court may consider when determining the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community." Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1197 (9th Cir. 2014); Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir. 2014) (en banc). The Ninth Circuit has stressed that this list of factors is meant to be helpful, not definitive. Alaska Rent-A-Car, 738 F.3d at 969.

"Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony." Primiano v. Cook, 598 F.3d 558, 564-65 (9th Cir. 2010). "'[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology.'" Primiano, 598 F.3d at 564. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Id. (citing Daubert, 509 U.S. at 594, 596); accord Summit 6, 802 F.3d at 1296. "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." Alaska Rent-A-Car, 738 F.3d at 969. Further, the Ninth Circuit has explained that "Rule 702 should be applied with a 'liberal thrust' favoring

admission." <u>Messick</u>, 747 F.3d at 1196.

Whether to admit or exclude expert testimony lies within the trial court's discretion. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 141-42 (1997); <u>United States v. Verduzco</u>, 373 F.3d 1022, 1032 (9th Cir. 2004) ("We . . . have stressed that the 'trial court has broad discretion to admit or exclude expert testimony'."). The Ninth Circuit has explained that "[a] trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 982 (9th Cir. 2011).

### B.     Plaintiff's Daubert Motions

In its two <u>Daubert</u> motions, Plaintiff moves to exclude certain opinions contained in Defendants' damages expert Dr. McDuff's rebuttal expert report and his supplemental rebuttal expert report for various reasons. (Doc. Nos. 167, 210-1.) The Court addresses each of these challenges in turn below.

#### i.     Apportionment

In his expert report, Dr. McDuff applies a two-step apportionment to the relevant royalty base to determine the reasonable royalty in this case. (Doc. No. 168-1, McDuff Report at 43.) First, Dr. McDuff reduces the royalty base according to survey data regarding the use of the MiFi that occurs while the user and device are in transit – what Defendants refer to as a "relevant use apportionment." (<u>Id.</u> at 21, 43, 52-55.) Second, Dr. McDuff reduced the royalty base by comparing the price of later models of the accused products to the original MiFi 2200 in order to account for the value of non-infringing features – what Defendants refer to as a "price-based apportionment." (<u>Id.</u> at 43, 53.) Plaintiff argues that Dr. McDuff's apportionment opinions should be excluded. (Doc. No. 167 at 3-14.)

#### a.     Double Apportionment

As an initial matter, Plaintiff argues that Dr. McDuff's analysis is inappropriate because he engages in a double apportionment. (Doc. No. 167 at 6.) In response, Defendants argue that Plaintiff's challenge to Dr. McDuff's two-step apportionment is not

supported by any authority and this his two-step apportionment was proper.  (Doc. No. 268 at 10.)

The Court agrees with Defendants.  Plaintiff has failed to provide the Court with any authority holding that it is improper for a damages expert to engage in a two-step apportionment.   To the contrary, the Federal Circuit has sanctioned multi-step apportionments in appropriate circumstances.  See, e.g., Summit 6, 802 F.3d at 1296-97 (approving the damages expert's multi-step apportionment).   Accordingly, the Court declines to exclude Dr. McDuff's analysis on the basis that he utilizes a two-step apportionment.

### b.     Use Apportionment

Plaintiff argues that the Court should exclude Dr. McDuff's use apportionment because it is based on the incorrect assumption that the accused products have non-infringing uses.  (Doc. No. 167 at 3-7.)  Plaintiff explains that the claims at issue are apparatus claims, not method claims, and, under patent law, unlike with a method claim, a device that directly infringes an apparatus claim always infringes.  (Id. at 5.)  Plaintiff argues, therefore, that it was improper for Dr. McDuff to restrict the economic value of the patents-in-suit to the period in which the accused devices are used at high speeds.  (Id.)

In response, Defendants argue that Dr. McDuff does not improperly assume that the accused products only infringe when used at high speeds.   (Doc. No. 288 at 7-8.) Defendants argue that Dr. McDuff properly utilizes data showing how often MiFi users actually utilize the claimed inventions technology to determine the actual economic value of the patents-in-suit.  (Id. at 3-4, 8-9.)

The Court recognizes that system and apparatus claims do not require the performance of any method steps and can be infringed by a device that is merely capable of operating in the relevant infringing mode even if it even though it may also be capable of noninfringing modes of operation.  Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1204 (Fed. Cir. 2010).  Nevertheless, how often a user of an accused device actually uses the relevant infringing technology can be relevant to the reasonable royalty

determination.  The Federal Circuit has "has sanctioned the use of the Georgia–Pacific factors to frame the reasonable royalty inquiry." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011).  Georgia-Pacific factor 10 considers "'the nature of the patented invention, its character in the commercial embodiment owned and produced by the licensor, and the benefits to those who used it.'"  AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1338 (Fed. Cir. 2015).  How often a user of an accused product actually utilizes the infringing technology is relevant to an analysis of how the claimed invention benefits the user, regardless of whether the claimed invention involves system/apparatus or method claims.  Cf. Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("the more frequently most inventions are used, the more valuable they generally are").[2]

The Court's role is not to make credibility decisions in deciding a Daubert issue. See Primiano, 598 F.3d at 564-65.  The patent's benefit to the user is a recognized factor under Georgia-Pacific.  As a result, the proper apportionment, if any, based on use goes to the weight of the damages expert's testimony, not its admissibility.[3]  See Finjan, Inc. v. Blue Coat Sys., Inc., No. 13-CV-03999-BLF, 2015 WL 4272870, at *6 (N.D. Cal. July 14, 2015).  The Ninth Circuit has explained that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano, 598 F.3d at 564; accord Summit 6, 802 F.3d at 1296.  Accordingly, the Court declines to exclude Dr. McDuff's use apportionment at this time.

### c.     Usage Data

Plaintiff also challenges the usage data relied on by Dr. McDuff to perform his use apportionment.  (Doc. No. 167 at 7-12.)  Plaintiff argues that Dr. McDuff cannot rely on

---

[2]     The Court recognizes that when the Federal Circuit stated this general economic principle in Lucent, it was dealing with method claims not apparatus claims.  But Plaintiff has failed to provide the Court with any case law holding that this general principle is limited to cases involving method claims.

[3]     The Court reserves the right, upon further development of the record at trial, to exclude Dr. McDuff's use apportionment.

16-cv-118-H-KSC

the Verizon "Use Survey" and the "American Time Use Survey" because the surveys are heavily flawed and contain incomplete and speculative data.  (Id.)

In response, Defendants argue that Dr. McDuff's reliance on these usage statistics is reasonable and reliable.  (Doc. No. 288 at 11-14.)  Defendants argue that any flaws contained in the surveys are matters for cross-examination, not exclusion.  (Id. at 12.)

In his expert report to perform his use apportionment, Dr. McDuff relies on data Verizon collected from users of the accused products during two 24-hour periods in two cities.  (Doc. No. 168-1, McDuff Report at 21-22, Attachment D-2.)  In addition, Dr. McDuff relies on an "American Time Use Survey," which is based on a Bureau of Labor Statistics 2015 survey of "American Time Use," and a Department of Transportation 2001 National Household Travel Study.  (Id. at 22-23, Attachment D-3.)

The Ninth Circuit has "long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'"  Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1036 (9th Cir. 2010). The Ninth Circuit has explained that:

> Treatment of surveys is a two-step process.  First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles?  This threshold question may be determined by the judge.  Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.  These are issues for a jury or, in a bench trial, the judge.

Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001); see also Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility.").

Here, the usage data relied on by Dr. McDuff is relevant to the reasonable royalty determination in this case, specifically, as explained above, it is relevant to an analysis of at least Georgia-Pacific factor 10.  See also Lucent, 580 F.3d at 1327 (explaining that usage data can, under appropriate circumstances, be relevant to the reasonable royalty

10

determination, and that such data may come from surveys and other sources).  Plaintiff raises several challenges to the methodologies contained in the surveys and the conclusions Dr. McDuff draws from the surveys.  (Doc. No. 167 at 7-12.)  But those challenges go to the weight to be given the surveys, not their admissibility.  See Clicks Billiards, 251 F.3d at 1263; see also Wendt, 125 F.3d at 814.  Thus, the surveys are admissible, and Dr. McDuff may appropriately rely on the data contained in the surveys under Federal Rule of Evidence 703 to form his damages opinions.[4]  See i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010) (holding that district court did not abuse its discretion in admitting usage survey into evidence and allowing damages expert to rely on the survey under Rule 703).  Accordingly, the Court declines to exclude Dr. McDuff's reliance on the usage statistics in his expert report.[5]

### d.     Price-Base Apportionment

Plaintiff argues that Dr. McDuff's price-based apportionment should be excluded because it violates the entire market value rule.  (Doc. No. 167 at 12-14.)  Specifically, Plaintiff argues that this apportionment runs afoul of the entire market value rule because Dr. McDuff fails to identify or analyze the components of the accused products to determine what components are infringing and non-infringing.  (Id. at 13.)

In response, Defendants argue that Dr. McDuff's analysis does not violate the entire market value because his reasonable royalty determination is not based on the entire market value of the accused products.  (Doc. No. 288 at 14.)  Defendants argue that contrary to Plaintiff's assertions, the entire market value rule does not mandate a single correct methodology for performing an apportionment.  (Id.)

The Court rejects Plaintiff's arguments.  The Court agrees with Defendants that Dr.

---

[4]     Because the data is admissible under Rule 703, the Court rejects Plaintiff's challenge to the Verizon data as not being admissible under Federal Rule of Evidence 1006.  (Doc. No. 279 at 3.)

[5]     In addition, the Court rejects Plaintiff's contention that Dr. McDuff is not qualified to render an opinion based on these statistics.  (Doc. No. 167 at 6-7.)

16-cv-118-H-KSC

McDuff's analysis does not violate the entire market value rule because his reasonable royalty analysis is not based on the entire market value of the accused products.  Under the entire market value rule, a party "can rely on the end product's entire market value as the royalty base" only if the party "can prove that the patented invention drives demand for the accused end product."  Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc., 809 F.3d 1295, 1302 (Fed. Cir. 2015).  Here, Dr. McDuff does not attempt to rely on the end product's entire market value as the royalty base in his reasonable royalty determination.  (See generally Doc. No. 168-1, McDuff Report.)  Thus, his analysis does not run afoul of the entire market value rule.

Further, the Court rejects Plaintiff's assertion that Dr. McDuff was required to conduct a component analysis of the accused products in order to perform an apportionment.  The Federal Circuit has recognizes that "under th[e] apportionment principle, 'there may be more than one reliable method for estimating a reasonable royalty.'"  Commonwealth Sci., 809 F.3d at 1301.  In his expert report, Dr. McDuff explains:  "For non-infringing functionality, I apportion based on the ratio of the first accused MiFi device (MiFi2200) divided by the observed average sales price over time . . .  This allows for removal of non-infringing functionality that has been added to the products over time, which improve the products value but do not relate to the patents-in-suit."  (Doc. No. 168-1, McDuff Report at 43.)  Here, Dr. McDuff provides a reasonable explanation for his apportionment, and, to the extent Plaintiff disagrees with his apportionment, Plaintiff may address the issue through cross-examination.  Accordingly, the Court declines to exclude Dr. McDuff's opinions regarding his price-based apportionment.

ii.    Licenses

Plaintiff challenges Dr. McDuff's use of comparable licenses in his reasonable royalty analysis.  (Doc. No. 167 at 2, 14-18.)  The Federal Circuit has "held many times, using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent."  Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1325 (Fed. Cir. 2014),

overruled by on other grounds by Williamson v. Citrix Online, LLC, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); see Prism Techs. LLC v. Sprint Spectrum L.P., 849 F.3d 1360, slip op. at 14 (Fed. Cir. 2017) (stating that it is a "long-accepted proposition that a 'party may use the royalty rate from sufficiently comparable licenses'"); see also LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."). The Federal Circuit "has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit." ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010).

"[I]n attempting to establish a reasonable royalty, the 'licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit.'" VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1330 (Fed. Cir. 2014). "Prior licenses, however, are almost never perfectly analogous to the infringement action." Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1227 (Fed. Cir. 2014); see also VirnetX, 767 F.3d at 1330 ("[W]e have never required identity of circumstances."). "Comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." Wordtech Sys., Inc v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010). Further, alleging "a loose or vague comparability between different technologies or licenses" is insufficient. LaserDynamics, 694 F.3d at 79.

Damages expert testimony "relying on licenses must account for such distinguishing facts when invoking them to value the patented invention. Recognizing that constraint, however, the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." Ericsson, 773 F.3d at 1227; see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the Gemstar and Grande license agreements as well as any

failure on the part of ActiveVideo's expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion.").

### a.      The Gogo License

Plaintiff argues that Dr. McDuff's analysis of the Gogo license is flawed and should be excluded. (Doc. No. 167 at 14.) Specifically, Plaintiff criticizes Dr. McDuff for not performing the same apportionment in his analysis of the Gogo license that he applies to his analysis of the reasonable royalty for the accused products. (Id. at 14-15; Doc. No. 279 at 4.) Plaintiff further argues that Dr. McDuff's failure to apportion the Gogo license violates the entire market value rule. (Doc. No. 167 at 14-15.)

In response, Defendants argue that Dr. McDuff's analysis of the Gogo license does not violate the entire market value rule. (Doc. No. 288 at 15.) Defendants argue that Plaintiff fails to cite to any authority excluding an expert from opining on a license due to a failure to apportion. (Id. at 15-16.) Defendants further argue that it was proper for Dr. McDuff to decline to apply a use apportionment to the Gogo license because Gogo's products, unlike the accused products, can only be used when moving at high speeds. (Id. at 16.)

The Court agrees with Defendants. Plaintiff has failed to provide any authority holding a damages expert's failure to apportion a license violates the entire market value rule. The fact that a license is not perfectly analogous to the license at issue in the hypothetical negotiation "generally goes to the weight of the evidence, not its admissibility." Ericsson, 773 F.3d at 1227; see ActiveVideo, 694 F.3d at 1333. Further, Dr. McDuff provides a reasonable explanation for not applying a use apportionment to the Gogo license: that the Gogo products, unlike the accused products, are always used while traveling at high speeds. (Doc. No. 168-1, McDuff Report ¶ 72.) Plaintiff disagrees with Dr. McDuff's assertion that the Gogo products are only used at high speeds. (Doc. No. 279 at 4.) But the factual basis of an expert's opinion goes to its credibility, not admissibility. Hose v. Chicago Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995); see also Apple, 757 F.3d at 1314 (explaining that evaluating the credibility of "one expert over

another" is a task "solely reserved for the fact finder"). Accordingly, the Court declines to exclude Dr. McDuff's opinions regarding the Gogo license.

### b. Novatel Licenses

Plaintiff also argues that the Court should exclude Dr. McDuff's opinions regarding the Novatel licenses. (Doc. No. 167 at 15-18.) Plaintiff argues that Dr. McDuff's analysis of the various Novatel licenses fails to properly analyze the economic comparability between those licenses and the facts in this case. (Id. at 15.) Plaintiff further argues that Dr. McDuff is not qualified to evaluate the technical comparability of the Novatel licenses to the patents-in-suit. (Id. at 16.)

In response, Defendants argue that Dr. McDuff took a standard economic approach to the Novatel licenses. (Doc. No. 288 at 16.) Defendants assert that Dr. McDuff first determined which agreements involved comparable technology relying on technical considerations from Defendants' technical expert Dr. Kenney, and he then assessed the economic comparability of the licenses to determine which ones were sufficiently comparable. (Id. at 16-17.)

A review of Dr. McDuff's expert report shows that he considered and accounted for the technological and economic differences between the Novatel licenses and the hypothetical license at issue here. (Doc. No. 168-1, McDuff Report ¶¶ 55-56, 58-60, 75-84.) Plaintiff criticizes Dr. McDuff for failing to consider certain factors or for failing to make certain adjustments in his analysis. But these concerns go to the weight of Dr. McDuff's testimony, not its admissibility, and should be addressed through cross-examination rather than through exclusion. See ActiveVideo, 694 F.3d at 1333.

Further, there is nothing improper about Dr. McDuff relying on discussions with Defendants' technical expert Dr. Kenney in determining that the Novatel licenses involve comparable technology. (See, e.g., Doc. No. 168-1, McDuff Report ¶ 56.) Dr. McDuff's reliance on Dr. Kenney's opinions to form his own damages opinions is permissible. See Apple, 757 F.3d at 1321 ("Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field."). Accordingly, the Court declines to exclude Dr.

McDuff's opinions and testimony regarding the Novatel licenses.

### c.    Licenses in Supplemental Report

Plaintiff argues that the Court should strike the analysis of certain licenses contained in Dr. McDuff's supplemental expert report because those licenses were never produced by Defendants during discovery in this action.  (Doc. No. 210-1 at 3-4.)  In response, Defendants argue that a <u>Daubert</u> motion is not the proper vehicle to challenge the timeliness of Defendants' production.  (Doc. No. 249 at 5.)  Defendants further argue that the timing of its production was proper, and that Plaintiff has failed to articulate any prejudice that it has suffered.  (<u>Id.</u>)

Defendants' production of those licenses concurrent with its service of Dr. McDuff's supplemental expert report was proper under the Court's January 26, 2017 scheduling order.  (Doc. No. 152.)  Further, the timing of the production was harmless.  Accordingly, the Court declines to strike the analysis of licenses contained in Dr. McDuff's supplemental expert report.

### iii.    The Hypothetical Negotiation Between Carucel and Verizon

Plaintiff argues that the Court should exclude Dr. McDuff's opinion that there would be no hypothetical negotiation between Carucel and Verizon because that opinion is improper as a matter of law.  (Doc. No. 210-1 at 1.)  Plaintiff argues that under Federal Circuit law, the hypothetical negotiation analysis must be made between the patentee and each infringer; whether the plaintiff and the defendant would have negotiated in actuality is legally irrelevant.  (<u>Id.</u>)

In response, Defendants argue that Dr. McDuff was justified in asserting that there would be no hypothetical negotiation between Plaintiff and Verizon because the hypothetical negotiation between Plaintiff and Novatel would have covered Verizon's infringement.  (Doc. No. 249 at 1.)  Defendants argue that when a downstream reseller such as Verizon is sued for infringement, it is appropriate to consider whether the hypothetical royalty would have been paid by the upstream manufacturer.  (<u>Id.</u> at 1-2.)

"Upon a showing of infringement, a patentee is entitled to 'damages adequate to

compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'" <u>ResQNet</u>, 594 F.3d at 868 (quoting 35 U.S.C. § 284). "A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." <u>Id.</u> "Critically, the hypothetical negotiation presumes that the patentee is a willing licensor and the alleged infringer is a willing licensee, with both parties assuming the patent was valid, enforceable, and infringed." <u>IP Innovation L.L.C. v. Red Hat, Inc.</u>, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010) (Radar, C.J.); <u>accord</u> <u>Aqua Shield v. Inter Pool Cover Team</u>, 774 F.3d 766, 771 (Fed. Cir. 2014) (explaining that the hypothetical negotiation "assumes infringement and validity of the patents and willingness of the parties to negotiate an agreement"); <u>see</u> <u>LaserDynamics, Inc. v. Quanta Computer, Inc.</u>, 694 F.3d 51, 75-76 (Fed. Cir. 2012) (describing the hypothetical negotiation as occurring between "a willing licensor and licensee").

In his expert report, Dr. McDuff opines that in this case, there would be no hypothetical negotiation between Plaintiff and Verizon. (Doc. No. 221, McDuff Supp. Report at 4, ¶ 10.) Dr. McDuff opines that the hypothetical negotiation "would be between Plaintiff and Novatel only." (<u>Id.</u> ("From an economic perspective, there would not be separate negotiations between Carucel and Novatel as a first negotiation, and then Carucel and Verizon as an additional negotiation . . . .").) The Court agrees with Plaintiff that this opinion is legally flawed.

In this case, Plaintiff accuses Verizon of infringing the patents-in-suit in addition to accusing Novatel of infringement. (Doc. No. 190 at 10-30.) The Federal Circuit has explained that a separate and distinct infringement "requires a separate evaluation of reasonable royalty damages." <u>Applied Med. Res. Corp. v. U.S. Surgical Corp.</u>, 435 F.3d 1356, 1362 (Fed. Cir. 2006). Further, because the hypothetical negotiation presumes "a willing licensor and licensee," <u>LaserDynamics</u>, 694 F.3d at 75-76, Dr. McDuff cannot assert that Verizon would not have engaged in the hypothetical negotiation with Plaintiff. Whether Verizon would have actually negotiated with Plaintiff is irrelevant to the

hypothetical negotiation.  See Oracle Corp. v. SAP AG, 765 F.3d 1081, 1088 (9th Cir. 2014); On Davis v. The Gap, Inc., 246 F.3d 152, 171 (2d Cir. 2001), as amended (May 15, 2001).

In addition, the primary cases relied on by Defendants in support of Dr. McDuff's position – Stickle v. Heublein, Inc., 716 F.2d 1550 (Fed. Cir. 1983) and Glenayre Elecs., Inc. v. Jackson, 443 F.3d 851, 857 (Fed. Cir. 2006) – are distinguishable from the present situation at this stage in the proceedings.  In Stickle, the Federal Circuit explained that when damages are based on a reasonable royalty, "a reasonable royalty is not to be separately calculated against each successive infringer.  Once full recovery is obtained from one infringer with respect to a particular infringing device, at most nominal additional damages may be awarded against another with respect to the same device."  716 F.2d at 1562; see also Glenayre Elecs., Inc. v. Jackson, 443 F.3d 851, 864 (Fed. Cir. 2006) ("[A] party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product.").  Here, there has not yet been a full recovery from one infringer with respect to the accused products.  Thus, Stickle and Glenayre are inapplicable at this time.  See Cambrian Sci. Corp. v. Cox Comm'ns, Inc., No. SACV111011AGJPRX, 2012 WL 12894475, at *3 (C.D. Cal. Nov. 19, 2012) (finding Stickle distinguishable because at the stage of the litigation "full recovery has not been obtained from any of the alleged infringers").  Accordingly, the Court grants this aspect of Plaintiff's Daubert motions.  The Court excludes Dr. McDuff's opinion that there would have been no hypothetical negotiation between Carucel and Verizon.

///

///

///

C.     Defendants' Daubert Motions

In their two <u>Daubert</u> motions, Defendants move to exclude certain opinions in Plaintiff's damages expert Dr. Kennedy's expert report and his supplemental expert report for various reasons.[6]  (Doc. Nos. 166, 220.)  The Court addresses each of these challenges in turn below.

i.     Licenses

Defendants move to exclude Dr. Kennedy's reliance on the SPH-Novatel license in his two expert reports.  (Doc. No. 166 at 3-14; Doc. No. 220 at 9-10.)  Defendants argue that Dr. Kennedy's reliance on the SPH-Novatel license is unreliable because it is a settlement agreement and because Dr. Kennedy failed to properly account for the circumstances surrounding the settlement agreement.  (<u>Id.</u> at 7-11.)  Defendants also argue that Dr. Kennedy's opinions regarding the agreement are unreliable because he failed to account for the covenant not to sue contained in the license.  (<u>Id.</u> at 11-12.)

In response, Plaintiff argues that Dr. Kennedy's reliance on the SPH-Novatel license was proper because he evaluated the technical and economic comparability of the SPH-Novatel license to the hypothetical license at issue here and took into account the differences between the licenses.  (Doc. No. 289 at 3.)  Plaintiff further argues that Defendants' challenges go to the weight of his opinions, not their admissibility.  (<u>Id.</u> at 3-10.)

The Court declines to exclude Dr. Kennedy's reliance on the SPH-Novatel license in his damages analysis.  The Federal Circuit has "held many times, using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent." <u>Apple</u>, 757 F.3d at 1325; <u>see</u> <u>Prism Techs.</u>, 849 F.3d 1360, slip op. at 14.  Further, the

---

[6]     As an initial matter, the Court rejects Plaintiff's argument that Defendants' <u>Daubert</u> motion regarding Dr. Kennedy's supplemental expert report is an impermissible second bite at the apple because Defendants previous moved to strike Dr. Kennedy's supplemental expert.  (Doc. No. 289-3 at 1.)  A motion to strike portions of an expert report for not being in compliance with the Court's scheduling orders is not the same thing as a <u>Daubert</u> motion.  <u>See, e.g.</u>, <u>Suchanek v. Sturm Foods, Inc.</u>, 311 F.R.D. 239, 244 (S.D. Ill. 2015).

16-cv-118-H-KSC

Federal Circuit "has recognized that, depending on the circumstances, a license agreement entered into in settling an earlier patent suit sometimes is admissible in a later patent suit involving the value of the patented technology, and sometimes is not." Prism Techs., 849 F.3d 1360, slip op. at 11; see also In re MSTG, Inc., 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties."); LaserDynamics, 694 F.3d at 79 ("Despite the longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages, we recently permitted such reliance under certain limited circumstances."). Indeed, in certain circumstances, it may be "the most reliable license in th[e] record." ResQNet, 594 F.3d at 872. Indeed, Defendants themselves recognize that settlement agreements can be relevant to the reasonable royalty determination as their own damages expert, Dr. McDuff, relies on settlement agreements in performing his reasonable royalty analysis – for example the Gogo license and the EON-Novatel license. (Doc. No. 168-1, McDuff Report at 34, 36, 44-46, 59.)

A review of Dr. Kennedy's expert reports shows that he considered and accounted for the technological and economic comparability of the SPH-Novatel license to the hypothetical license at issue here. (Doc. No. 187-1, Kennedy Report at 24-28.) See Wordtech Sys., 609 F.3d at 1320 ("Comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them."). Based on those consideration, Dr. Kennedy determined that the license was informative of the Carucel-Novatel reasonable royalty in this case. (Doc. No. 187-1, Kennedy Report at 28.) Thus, Dr. Kennedy can rely on SPH-Novatel license despite the fact that it is a litigation settlement agreement, just as Defendants' damages expert can rely on the Gogo license and the EON-Novatel license despite the fact that those are also litigation settlement agreements. To the extent Defendants disagree with Dr. Kennedy's considerations or contend that he failed to consider certain other factors or licenses in his analysis, (Doc. No. 166 at 8-11), these concerns go to the weight of Dr. Kennedy's testimony, not its admissibility. See Ericsson, 773 F.3d at 1227; ActiveVideo, 694 F.3d at 1333.

Further, the Court rejects Defendants' challenges to Dr. Kennedy's use of the face value of the royalties in the settlement agreement. (Doc. No. 166 at 11-12.) In his analysis, Dr. Kennedy relies on the royalty payments that are provided on the face of the agreement itself. (Doc. No. 187, Kennedy Report at 28.) To the extent Defendants contend that Dr. Kennedy also needed to account for the covenant not to sue, that is a matter for cross-examination, not exclusion.

Finally, the Court rejects Defendants' challenges to Dr. Kennedy's adjustments to the SPH-Novatel agreement's royalty. (Doc. No. 166 at 12-14.) Dr. Kennedy may rely on Dr. Kiasaleh's expert opinions along with his own opinions to determine that the diversity patents are roughly three times as valuable as the '904 patent. (Doc. No. 187-1, Kennedy Report at 53-54.) See Apple, 757 F.3d at 1321 ("Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field."). Accordingly, the Court declines to exclude Dr. Kennedy's opinions regarding the SPH-Novatel license.

### ii.    Entire Market Value Rule

Defendants argue that Dr. Kennedy's incremental profit analysis should be excluded because it violates the entire market value rule. (Doc. No. 166 at 14-17.) In response, Plaintiff argues that Defendants' challenge to Dr. Kennedy's incremental profit analysis is based on the incorrect assumption that he used the antenna costs in that analysis as a royalty base in this case. (Doc. No. 289 at 11-12.) Plaintiff argues that because he did not do this, his analysis does not violate the entire market value rule. (Id.)

The Court agrees with Plaintiff and rejects Defendants' arguments. Dr. Kennedy's incremental profit analysis does not run afoul of the entire market value rule because, as Defendants' concede, Dr. Kennedy does not actually present a damages calculation based on this analysis. (Doc. No. 166 at 15.) (See Doc. No. 187-1, Kennedy Report at 29-31, Ex. D.7.) The entire market value rule is at issue when a damages expert uses the "end product's entire market value as the royalty base." Commonwealth Sci., 809 F.3d at 1302. Because in his incremental profits analysis Dr. Kennedy does not attempt to use the cost of the antenna components as the royalty base in this case, the entire market value rule is

inapplicable.    Accordingly, the Court declines to exclude Dr. Kennedy's incremental profits analysis.

### iii.    Separate Reasonable Royalty Analysis for Verizon

Defendants argue that the Court should exclude the reasonable royalty analysis contained in Dr. Kennedy's supplemental expert report because it is predicated on a hypothetical negotiation between Carucel and Verizon rather than a hypothetical negotiation between Carucel and Novatel.  (Doc. No. 220 at 10-14.)  Defendants argue that Verizon would not be a party to the hypothetical negotiation because Novatel is defending and indemnifying Verizon in this case.  (Id. at 11.)  Defendants further argue that patent law recognizes that the hypothetical negotiation should generally be conducted between the patentee and the manufacturer of the accused product, not the patentee and a downstream user or re-seller.  (Id. at 12.)

In response, Plaintiff argues that it was proper for Dr. Kennedy to perform a separate hypothetical negotiation between Carucel and Verizon because different acts of infringement necessitate different hypothetical negotiations.  (Doc. No. 289-3 at 2-3.) Plaintiff argue that under the "full compensation rule" they are entitled to damages from both Novatel and Verizon's acts of infringement.  (Id. at 3-4.)

In his expert report, Dr. Kennedy performs a reasonable royalty analysis that "is based on a hypothetical negotiation between Carucel and Novatel."  (Doc. No. 187-1, Kennedy Report at 19.)  At the conclusion of this analysis, Dr. Kennedy opines that the amount Novatel would have paid to obtain a license to the patents-in-suit would be $15,504,196 as a running royalty or $12,898,192 as a lump sum.  (Id. at 51-55.)  In his supplemental expert report, Dr. Kennedy performs a reasonable royalty analysis as to Verizon.   In the supplemental expert report, Dr. Kennedy explains that his "Verizon analysis reflects a separate royalty negotiation between Carucel and Verizon."  (Doc. No. 187-1, Kennedy Supp. Report at 2.)  At the conclusion of this analysis, Dr. Kennedy opines that the amount Verizon would have paid to obtain a license to the patents-in-suit through this separate negotiation would be $32,866,614 as a running royalty or $29,762,601 as a

22

1    lump sum.  (Id. at 54-61.)

2         The Court declines to exclude Dr. Kennedy's separate reasonable royalty analysis

3    for Verizon.  In this case, Plaintiff accuses Verizon of infringing the patents-in-suit in

4    addition to accusing Novatel of infringement.  (Doc. No. 190 at 10-30.)  The Federal Circuit

5    has explained that a separate and distinct infringement "requires a separate evaluation of

6    reasonable royalty damages."  Applied Med. Res., 435 F.3d at 1362.  Thus, it was not

7    improper for Dr. Kennedy to perform a separate reasonable royalty analysis based on a

8    separate hypothetical negotiation as to Defendant Verizon.  Further, because a hypothetical

9    negotiation assumes validity and infringement of the patents-in-suit and a willing licensor

10   and licensee, Aqua Shield, 774 F.3d at 771; LaserDynamics, 694 F.3d at 75-76, Dr.

11   Kennedy can perform this separate reasonable analysis despite the existence of an

12   indemnity agreement between Novatel and Verizon.  Whether Verizon would have actually

13   negotiated with Plaintiff is irrelevant to the hypothetical negotiation.  See Oracle, 765 F.3d

14   at 1088; On Davis, 246 F.3d at 171.  Moreover, as explained with respect to Plaintiff's

15   Daubert motions, the primary cases relied on by Defendants in support of their position

16   that Dr. Kennedy cannot perform two separate reasonable royalty analyses are

17   distinguishable from the present situation at this stage in the proceedings.  See Cambrian

18   Sci., 2012 WL 12894475, at *3 (finding Stickle distinguishable because at the stage of the

19   litigation "full recovery has not been obtained from any of the alleged infringers").

20   Accordingly, the Court declines to exclude Dr. Kennedy's separate reasonable royalty

21   analysis as to Verizon contained in his supplemental expert report.[7]

22        Nevertheless, the Court expressly notes that although Plaintiff through Dr. Kennedy

23   may present to the jury a reasonable royalty analysis as to Novatel and a separate

---

26   [7]     In their Daubert motion, Defendants state that if Dr. Kennedy's damages theory against Verizon
27   is precluded, then they request that Verizon be severed and stayed from this case.  (Doc. No. 220 at 19-
     20.)  Because the Court has not precluded Dr. Kennedy's damages analysis against Verizon,
28   Defendants' untimely request for severance is moot.

reasonable royalty analysis as to Verizon, Plaintiff may not recovery both reasonable royalties. In <u>Stickle</u>, the Federal Circuit explained that when damages are based on a reasonable royalty, "a reasonable royalty is not to be separately calculated against each successive infringer. Once full recovery is obtained from one infringer with respect to a particular infringing device, at most nominal additional damages may be awarded against another with respect to the same device." 716 F.2d at 1562; <u>see also</u> <u>Glenayre Elecs.</u>, 443 F.3d at 864 ("[A] party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product."). Dr. Kennedy clearly states in his expert reports that he has performed two separate reasonable royalty analyses based on two separate hypothetical negotiations – one involving Carucel and Novatel and one involving Carucel and Verizon – to determine what Novatel would have paid for a license to the patents-in-suit and what Verizon separately would have paid for a license. (<u>See</u> Doc. No. 187-1, Kennedy Report at 19, 51-55; Doc. No. 187-1, Kennedy Supp. Report at 2, 54-61.) Because these reasonable royalty determinations are separate as to the two successive infringers, Plaintiff may not recover both royalties.[8]   <u>See</u> <u>Stickle</u>, 716 F.2d at 1562;

---

[8]   In this context, the Court rejects Plaintiff's reliance on <u>Applied Med. Res. Corp. v. U.S. Surgical Corp.</u> and <u>Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.</u>, as those two cases are easily distinguishable from the present case. In <u>Applied Med. Res.</u>, the Federal Circuit explained that a separate and distinct infringement "requires a separate evaluation of reasonable royalty damages." 435 F.3d at 1362. But, here, the Federal Circuit is merely discussing how reasonable royalty damages are to be evaluated, not what is actually recoverable. More importantly, in that case, the two different infringements that the Federal Circuit was referencing involved two different products, not the same product being sold by two different defendants, an upstream manufacturer and a downstream reseller. In <u>Stickle</u>, the Federal Circuit expressly stated that its holding applies when the reasonable royalty is being awarded "with respect to the same device." 716 F.2d at 1562.

In <u>Mahurkar</u>, the district explained that "[f]ull compensation is possible only if each infringer pays damages computed by multiplying the total lost profit by each infringer's share of the infringing sales." But in this passage, the district court is expressly talking about lost profit damages, not reasonable royalty damages. This distinction is important because in <u>Stickle</u>, the Federal Circuit explained that for lost profit damages, unlike reasonable royalty damages, "[i]n appropriate circumstances a patent owner may be able to recover the patent owner's lost profits attributable to each of a series of infringers." 716 F.2d at 1562. Further, the Court notes that Plaintiff has failed to cite to

Glenayre, 443 F.3d at 864; see also Donald S. Chisum, Chisum on Patents § 20.03[7][b][iii]2 (2017.) ("[R]ecovery of an appropriate royalty-based award against an infringing manufacturer should preclude any further recovery against resellers or users of the products in question.").

### iv.    The Broadcom-Verizon License

Defendants argue that even if the Court permits Dr. Kennedy to perform a separate reasonable royalty analysis as to Verizon, the Court should exclude Dr. Kennedy's reliance on the Broadcom-Verizon license because that license is not sufficiently comparable to the hypothetical negotiation between Carucel and Verizon.  (Doc. No. 220 at 14-17.)   In response, Plaintiff argues that Dr. Kennedy's use of the Broadcom-Verizon license is permissible because he performed an extensive analysis of the technical and economic comparability of the Broadcom-Verizon license and took into account differences between the Broadcom-Verizon license and the hypothetical Carucel-Verizon license.  (Doc. No. 289-3 at 4-5.)  Plaintiff further argues that Defendants' criticism of Dr. Kennedy's analysis of the license should be addressed through cross-examination, not exclusion.  (Id. at 6-7.)

A review of Dr. Kennedy's supplemental expert report shows that he considered and accounted for the technological and economic comparability of the Broadcom-Verizon license to the hypothetical license at issue here.  (Doc. No. 187-1, Kennedy Supp. Report at 22-26, 42-45, 50, 52-53, 56-60.)  See Wordtech Sys., 609 F.3d at 1320 ("Comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them.").   In their motion, Defendants identify several differences between the Broadcom-Verizon license and the license at issue here and argue that Dr. Kennedy has failed to properly account for those differences.  But these differences go to the weight of Dr. Kennedy's testimony, not its admissibility.  See Ericsson, 773 F.3d at 1227; ActiveVideo, 694 F.3d at 1333.  Defendants also criticize Dr. Kennedy for relying

---

one case where a patentee was permitted to recover a reasonable royalty against an upstream manufacturer/seller and then also recover a separate reasonable royalty against a downstream customer/reseller on the same product.

on the $6 per-unit royalty rate in the license without also accounting for the license's $200 million royalty cap.  (Doc. No. 220 at 16-17.)  The Court agrees with Plaintiff that this issue would more appropriately be addressed through cross-examination rather than through exclusion.  Accordingly, the Court declines to exclude Dr. McDuff's opinions and testimony regarding the Broadcom-Verizon license.

v.    Verizon's Profits

Defendants argue that Dr. Kennedy's analysis of Verizon's profitability on the MiFi devices is unreliable.  (Doc. No. 220 at 17-19.)  Specifically, Defendants argue that it was improper for Dr. Kennedy to calculate Verizon's profitability as to the MiFi devices based on Verizon's no-contract sales prices for the devices when Verizon actually sells the vast majority of the devices below that no-contract price.  (Id. at 17.)

In response, Plaintiff argues that Defendants' contention should be rejected because Defendants' arguments are based on the fiction that Verizon does not profit from its sales of the MiFi devices.  (Doc. No. 289-3 at 7.)  Plaintiff explains that Verizon is able to sell the majority of the MiFi devices at a loss because it bundles its sales of those devices with sales of data plans.  (Id. at 7-9.)  Plaintiff argues, therefore, it was reasonable and proper for Dr. Kennedy to analyze Verizon's profitability based on the standalone price of the devices when they are purchased without a contract.  (Id. at 9.)

The Court agrees with Plaintiff.  It was entirely reasonable for Dr. Kennedy to evaluate Verizon's profitability as to the MiFi devices based on the standalone no-contract sales prices for the devices in light of the evidence in the record showing that Verizon subsidizes the price for its MiFi devices through data plan revenues.  (See Doc. No. 187-1, Kennedy Supp. Report at 10-18 ("The standalone no-contract price is an actual market price charged by Verizon and paid by consumers without additional obligations by Verizon related to the provision of wireless services.").)  To the extent Defendants assert that this was unreasonable, they can address that issue through cross-examination of Dr. Kennedy.

In addition, the Court agrees with Plaintiff that Defendants' arguments regarding convoyed sales are without merit.  The law regarding convoyed sales is inapplicable here

because Dr. Kennedy did not include the service plan revenues in his royalty base.  Rather, Dr. Kennedy only included Verizon's revenue as measured by the stand-alone equipment price of the MiFi devices.   (See Doc. No. 187-1, Kennedy Supp. Report at 19.) Accordingly, the Court declines to exclude Dr. Kennedy's analysis of Verizon's profitability on the MiFi devices.

## II.    Motions in Limine

### A.    Plaintiff's Motion in Limine No. 1

In its first motion in limine, Plaintiff moves to preclude Defendants from using derogatory or misleading characterizations of Plaintiff, including, for example, the terms "patent troll," "patent assertion entity," and "a company that just sues people for money." (Doc. No. 232 at 2.)  Plaintiff argues that such terms or characterizations are irrelevant to the issues in this case and would be unduly prejudicial to Plaintiff due to the high risk of creating a negative impression of Plaintiff.  (Id.)

In response, Defendants state that they agree not to use derogatory terms, such as "patent troll" and "a company that just sues people for money" at trial.  (Doc. No. 252 at 1.)  But Defendants argue that they should be able to describe Plaintiff's business in neutral and factual terms, such as by referring to Plaintiff as a "patent assertion entity."   (Id.) Defendants assert that Plaintiff has no history of making or bringing a product to market, and, therefore, the term "patent assertion entity" is an accurate description of the Plaintiff's business.  (Id. at 2.)

Because Defendants agree not to refer to Plaintiff as a "patent troll" or "a company that just sues people for money," that aspect of Plaintiff's motion in limine is denied as moot.   As for the remainder of Plaintiff's motion in limine, the Court agrees with Defendants that it is permissible for Defendants to refer to Plaintiff in neutral, factual terms, such as "non-practicing entity" or "patent assertion entity."[9]   See Digital Reg. of Texas,

---

[9]    At the hearing on the parties' motions in limine, Plaintiff stated that the term "patent assertion entity" is permissible.

16-cv-118-H-KSC

LLC v. Adobe Sys., Inc., No. C 12-1971 CW, 2014 WL 4090550, at *12 (N.D. Cal. Aug. 19, 2014) (explaining that the plaintiff's "status as a non-practicing entity is relevant to damages and the Georgia–Pacific factors"); see, e.g., Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., No. 2:13-CV-213-JRG-RSP, 2015 WL 627430, at *1 (E.D. Tex. Jan. 31, 2015) (permitting the defendant to refer to the plaintiff as a "patent assertion entity"); HTC Corp. v. Tech. Properties Ltd., No. 5:08-CV-00882-PSG, 2013 WL 4782598, at *4 (N.D. Cal. Sept. 6, 2013) (permitting the defendant to refer to the plaintiff as a "non-practicing entity" or a "patent assertion entity"). Accordingly, the Court denies Plaintiff's first motion in limine without prejudice to a contemporaneous objection at trial.

### B.    Plaintiff's Motion in Limine No. 2

In its second motion in limine, Plaintiff moves to exclude certain licenses and other documents that were produced concurrently with Defendants' damages expert Dr. McDuff's supplemental damages expert report.[10]  (Doc. No. 233 at 2.)  Plaintiff argues that these documents should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1) because Defendants failed to produce these documents prior to the fact discovery deadline in this case.  (Id.)  Plaintiff argues that Defendants failed to produce these documents during fact discovery despite the fact that Plaintiff specifically sought these documents in its Requests for Production Nos. 26, 27, 32, 48, 49, and 51.  (Id. at 4.)  Plaintiff further argues that it was prejudiced by Defendants' untimely disclosure.  (Id. at 5.)

In response, Defendants argue that the documents should not be excluded because the production at issue was properly served in response to Plaintiff's supplemental damages expert report.  (Doc. No. 253 at 1-2.)  Defendants further argue that none of Plaintiff's RFPs reasonably required production of the documents at issue.  (Id. at 3-4.)  In addition, Defendants argue that the timing of the production was harmless.  (Id. at 4-5.)

The Court declines to exclude the documents at issue.  The documents were not

---

[10]    Some of the exhibits that Plaintiff moved to exclude in its motion in limine are publicly available documents.  (See Doc. No. 253 at 5-6.)  In its reply brief, Plaintiff clarifies that it is no longer seeking to exclude these publicly available exhibits.  (Doc. No. 282 at 1 n.1.)

untimely produced.  On January 26, 2017, the Court granted the parties' joint motion to modify the scheduling order to allow for supplemental damages expert reports.  (Doc. No. 152.)  These document were timely produced under that scheduling order in response to Plaintiff's supplemental damages expert report.  Further, the Court agrees with Defendants that none of the RFPs identified by Plaintiff in its motion in limine reasonably requested production of the documents at issue.  (See Doc. No. 253 at 3-4.)

Moreover, even assuming Defendants' production of these documents was untimely, the timing of the production was harmless.  Under the Court's January 26, 2017 Order, Plaintiff was permitted to depose Defendants' damages expert regarding his supplemental rebuttal expert report[11] and to file a Daubert motion as to the supplemental rebuttal expert report.  (Doc. No. 152.)  Plaintiff argues that it was prejudiced by the disclosure of these documents because its damages expert, Dr. Kennedy, was unable to consider these documents and include them in his expert report.  (Doc. No. 233 at 5.)  But this claim of prejudice is remedied by the fact that the Court will grant Plaintiff's request to allow Dr. Kennedy to address the licenses at issue at trial. Because the disclosure of these documents was harmless, the documents should not be excluded pursuant to Rule 37(c)(1).  See Fed. R. Civ. P. 37(c)(1); Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001) (explaining that "information may be introduced [despite a failure to comply with Rule 26(a) or (e)] if the parties' failure to disclose the required information is . . . harmless").  Accordingly, the Court denies Plaintiff's second motion in limine without prejudice to a contemporaneous objection at trial.

C.     Plaintiff's Motion in Limine No. 3

In its third motion in limine, Plaintiff moves to exclude Trial Exhibit FG (Verizon's "Use Survey").  (Doc. No. 234 at 2.)  Plaintiff argues that the exhibit should be excluded because Verizon failed to produce the document during discovery.  (Id. at 2-3.)  Plaintiff

---

[11]     Plaintiff declined to depose Dr. McDuff regarding his supplemental rebuttal expert report.  (Doc. No. 253 at 5.)

further argues that the Use Survey is inadmissible hearsay and that it is not admissible under Federal Rule of Evidence 703.  (Id. at 3-7.)

In response, Defendants argue that they timely produced the Use Survey by attaching it to Dr. McDuff's expert report, which was served during the discovery period.  (Doc. No. 254 at 2-3.)  Defendants further argue that the survey may be properly admitted under Federal Rule of Evidence 703.  (Id. at 3-6.)

The Court declines to exclude the use survey.  Defendants' production of the Use Survey was timely.  Defendants attached the use survey and its underlying data to Dr. McDuff's expert report, which was served on December 23, 2016 within the Court's deadlines for fact and expert discovery.  Further, Plaintiff fails to explain how it was prejudiced by the timing of Defendants' disclosure of the Use Survey.

Further, even assuming the survey is hearsay, the Use Survey is admissible under Federal Rule of Evidence 703.[12]  See i4i, 598 F.3d at 856; see also Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1261–62 (9th Cir. 1984) ("Rule 703 . . . permits . . . hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion).  Plaintiff argues that for the reasons given in its pending Daubert motion, the Use Survey is unreliable and prejudicial.  (Doc. No. 234 at 7.)  But the Court has denied this aspect of Plaintiff's Daubert motion and rejected Plaintiff's challenges to the Use Survey.  See supra.  Accordingly, the Court denies Plaintiff's third motion in limine without prejudice to a contemporaneous objection at trial.

### D.    Plaintiff's Motion in Limine No. 4

In its fourth motion in limine, Plaintiff moves for the Court to issue an order holding that the parties may not contradict the Court's claim construction order or the Court's order denying Defendants' motion for summary judgment, specifically as to the terms "adapted to/configured to" and "frequency band." (Doc. No. 286 at 1.)  Plaintiff argues that such an

---

[12]    At the motion in limine hearing, Defendants clarified that they will not be moving to admit the Use Survey into evidence at trial.

order is necessary because it would be inappropriate, confusing, and unduly prejudicial for Defendant to present argument and testimony asserting constructions that the Court has already rejected as a matter of law.  (Id.)

In response, Defendants argue that Plaintiff's motion is an untimely partial motion for summary judgment of infringement disguised as a motion in limine.  (Doc. No. 255 at 1.)  Defendants further assert that their non-infringement arguments do not contradict the Court's claim construction order, and that the Court has held that there is a genuine issue of fact as to whether the accused products satisfy the "adapted to/configured to" and "frequency band" claim limitations.  (Id.)

"[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court."  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996); accord Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 835 (2015).  A court's claim construction is "law of the case" for purposes of trial.   Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1371 n.2 (Fed. Cir. 2007).  "No party may contradict the court's construction to a jury."  Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial."); see also Cordis Corp. v. Boston Sci. Corp., 561 F.3d 1319, 1337 (Fed. Cir. 2009) ("[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'").  Thus, "[a]ny expert testimony must adhere to the court's claim constructions and must not apply alternative claim constructions."  Dynetix Design Sols., Inc. v. Synopsys, Inc., No. C 11-5973 PSG, 2013 WL 4537838, at *4 (N.D. Cal. Aug. 22, 2013); see, e.g., BMC Software, Inc. v. Servicenow, Inc., No. 2:14-CV-903-JRG, 2016 WL 367251, at *2 (E.D. Tex. Jan. 29, 2016).  Nevertheless, "[a]t trial, parties may 'introduc[e] evidence as to the plain and ordinary meaning of terms not construed by the Court to one skilled in the art,' so long as the evidence does not amount to 'argu[ing] claim construction to the jury.'"  Apple, Inc. v. Samsung Elecs. Co., No. 12-CV-00630-LHK, 2014 WL 660857, at *3 (N.D. Cal. Feb. 20,

2014) (citations omitted); accord Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc., 87 F. Supp. 3d 928, 945 (N.D. Cal. 2015).

The Court cautions the parties that the arguments and evidence they present at trial must adhere to the Court's claim construction order, and the parties may not argue claim construction to the jury. Nevertheless, the Court concludes that any concerns about a party presenting argument or testimony that is contrary to the Court's claim constructions at trial would more appropriately be addressed through a contemporaneous objection at trial rather than through preclusion of certain arguments or testimony. Accordingly, the Court denies Plaintiff's motion in limine without prejudice to a contemporaneous objection at trial.[13]

### E.      Defendants' Motion in Limine No. 1

In their first motion in limine, Defendants move to preclude any evidence, testimony, opinion, or argument regarding the infringement theories presented in Plaintiff's technical expert Dr. Kamran Kiasaleh's February 2017 declaration that was attached to Plaintiff's opposition to Defendants' motion for summary judgment. (Doc. No. 238 at 1.) Defendants argue that the declaration included a new theory of infringement that Dr. Kiasaleh had failed to disclose in his original expert report and, therefore, the declaration should be excluded. (Id. at 2.)

In response, Plaintiff argues that the declaration should not be excluded because Dr. Kiasaleh did not present substantively new testimony, opinions, or theories on

---

[13]      In its reply to its motion in limine, Plaintiff states that the parties dispute the meaning of the term "frequency band" and, therefore, Plaintiff requests that the Court resolve the parties' dispute prior to trial. (Doc. No. 284 at 2 n.1.)  The Court rejects Plaintiff's request.  It is entirely improper for Plaintiff to make this request in a footnote in a reply brief to a motion in limine that is filed one week prior to trial.  See Novosteel SA v. U.S., Bethlehem Steel Corp., 284 F.3d 1261, 1274 (Fed. Cir. 2002) (explaining that "as a matter of litigation fairness and procedure" arguments and issues raised for the first time in a reply brief are waived).  This request could have been raised at the summary judgment stage and Plaintiff provides no explanation for why it did not do so at that time or why it did not do so at least when it filed the present motion in limine rather than through a reply brief.  Further, the Court has not received briefing from the parties as to the construction of the term "frequency band."  See SIPCO, LLC V. Abb, Inc., No. 6:11-CV-0048 LED-JDL, 2012 WL 3112302, at *17 (E.D. Tex. July 30, 2012), adopted by 2012 WL 12842877 (E.D. Tex. Oct. 23, 2012) (declining to construe term where there was an absence of briefing and argument on the term).

infringement in his February 2017 declaration.  (Doc. No. 258 at 1.)  Plaintiff argues that Dr. Kiasaleh has always opined that the accused devices were designed to work in traffic and comply with LTE and CDMA standards.  (Id.)

Federal Rule of Civil Procedure 26(a)(2)(B)(i) provides that an expert report must contain "a complete statement of all opinions the witness will express."  Thus, "[a]ll expert witnesses at trial must tether their testimony to the contents of their respective reports, and are precluded from exceeding the scope of their reports."  AngioScore, Inc. v. TriReme Med., Inc., No. 12-CV-03393-YGR, 2015 WL 5258786, at *1 n.1 (N.D. Cal. Sept. 8, 2015); see, e.g., Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc., 725 F.3d 1341, 1354 (Fed. Cir. 2013) (affirming district court's striking in part of an expert declaration that included untimely disclosures); Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 995 (Fed. Cir. 2007) (affirming district court's exclusion of expert testimony that fell outside the expert's report).  Nevertheless, "[t]he purpose of [an expert] report[] is not to replicate every word that the expert might say on the stand.  It is instead to convey the substance of the expert's opinion (along with the other background information required by Rule 26(a)(2)(B)) so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary."  Walsh v. Chez, 583 F.3d 990, 994 (7th Cir. 2009); accord Ohio Six Ltd. v. Motel 6 Operating L.P., No. CV 11-08102 MMM (EX), 2013 WL 12125747, at *14 (C.D. Cal. Aug. 7, 2013).

The Court has reviewed the opinions set forth in the Dr. Kiasaleh's expert report and in his declaration.  The Court disagrees with Defendants that the Kiasaleh declaration includes a new theory of infringement that was not disclosed in his expert report.  Rather, the declaration contains the same theory of infringement as his expert report, and it simply provides more detail as to that theory of infringement – that the accused products satisfy the "adapted to/configured to" limitation because they connect to the internet through wireless technologies and are designed to be portable and to operate in a moving vehicle in traffic.  (Compare Doc. No. 202-2, Kiasaleh Decl. ¶¶ 20-22 with Doc. No. 202-2, Kiasaleh Decl. Ex. 3 at 55, 108, 159, 215.)  This is permissible under Rule 26(a)(2)(B).

1  See Cheese Sys., 725 F.3d at 1354; Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP,

2  No. 07CV280-IEGRBB, 2008 WL 5147201, at *11 (S.D. Cal. Dec. 8, 2008).  Accordingly,

3  the Court denies Defendants' first motion in limine without prejudice to a

4  contemporaneous objection at trial.

5      F.      Defendants' Motion in Limine No. 2

6          Charles D. Gavrilovich is the named inventor of the '904 patent.  See '904 Patent.

7  In their second motion in limine, Defendants move to exclude Plaintiff from discussing the

8  technology or value of non-asserted patents that list Mr. Gavrilovich as the named inventor

9  and that Plaintiff purports were valued at over $1 billion.  (Doc. No. 239 at 2.)  Defendants

10  clarify that they do not necessarily object to Plaintiff making a general statement that Mr.

11  Gavrilovich is the named inventor of roughly twenty other patents.  (Id. at 3 n.1.)  Rather,

12  Defendants specifically object to any discussion of the technology or the purported value

13  of the non-asserted patents because such argument or testimony is irrelevant and has a risk

14  of causing jury confusion and wasting time by having a mini-trial as to the merits and actual

15  value of these patents.  (Id. at 2.)

16          In response, Plaintiff argues that it should be allowed to provide a brief background

17  to the jury explaining who Mr. Gavrilovich was, what jobs he had, and what he did with

18  his life.  (Doc. No. 259 at 1.)  Plaintiff argues that in this context, it is appropriate for it to

19  mention that Mr. Gavrilovich was an inventor with many high-value patents.  (Id.)

20          The Court recognizes that the parties in this case should able to present themselves

21  to the jury and give a general background of themselves and their witnesses without

22  causing any undue prejudice.  Therefore, Plaintiff may provide a limited discussion of these

23  non-asserted patents and their general subject matter at trial when discussing Mr.

24  Gavrilovich's background.   Nevertheless, the Court agrees with Defendants that a

25  discussion of the value of these non-asserted patents would likely lead to unfair prejudice

26  and jury confusion substantially outweighing the limited probative value of such evidence.

27  See Fed. R. Evid. 403.  Accordingly, the Court grants in part and denies in part Defendants'

28  second motion in limine.  Plaintiff is precluded from providing argument or testimony

regarding the purported value of the non-asserted patents.[14]   The Court denies the remainder of Defendants' motion in limine without prejudice to a contemporaneous objection at trial.[15]

### G.   Defendants' Motion in Limine No. 3

In their third motion in limine, Defendants move to preclude Plaintiff from offering into evidence at trial Plaintiff's Exhibit TE125, a YouTube video entitled "Sprint MiFi Commercial." (Doc. No. 240 at 2.) Defendants argue that the video should be precluded because Plaintiff has failed to lay a proper foundation for the video regarding authentication. (Id.) In addition, Defendants argue that the video is inadmissible hearsay. (Id. at 3-4.)

In response, Plaintiff argues that it has made a sufficient showing for authentication because the video itself includes information showing Sprint as the source of the commercial, and Novatel's former CTO Dr. Souissi testified at his deposition about the existence of such a commercial. (Doc. No. 260 at 1.) In addition, Plaintiff argues that the video is not hearsay because Plaintiff will not be introducing the video at trial to prove the truth of the matters asserted in the commercial, but rather will introduce it to simply show what representations were made to the public. (Id. at 2.) Plaintiff further argues that statements offering a product for sale are "verbal acts," not hearsay. (Id.)

"Authentication is a 'condition precedent to admissibility.'" Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). Under Federal Rule of Evidence 901(a), to satisfy the requirement of authentication, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Accord Orr, 285 F.3d

---

[14]   The Court cautions Defendants that although the Court at this time is precluding argument and testimony regarding the value of the non-asserted patents, the Court will reconsider this ruling if, at trial, Defendants open the door to such testimony.

[15]   At the pretrial conference, Defendants argued that Plaintiff should not be permitted to introduce these non-asserted patents into evidence. But, at that same hearing, Plaintiff represented that it will not move to admit the non-asserted patents into evidence.

16-cv-118-H-KSC

at 773.  This rule requires the proponent of the evidence to make a prima facie showing of authenticity such that a reasonable juror could find in favor of authenticity.  <u>United States v. Yin</u>, 935 F.2d 990, 996 (9th Cir. 1991).

Plaintiff has made a sufficient prima facie showing of authenticity as to the YouTube video.  The information in the video combined with Dr. Souissi's testimony is sufficient for a reasonable jury to find in favor of authenticity.[16]  In addition, Plaintiff has represented that it will not seek to introduce the video at trial to prove the truth of the matters asserted in the video, but will instead introduce it to show what representations were made in the video.  <u>See</u> Fed. R. Evid. 801(c) (defining hearsay as a statement "a party offers in evidence to prove the truth of the matter asserted in the statement"); <u>see also</u> <u>Burtscher v. Moore</u>, No. CV1102309DMGJEMX, 2013 WL 12122230, at *10 n.5 (C.D. Cal. Feb. 7, 2013) (explaining that offering a product for sale is a "verbal act," which is not hearsay).  Accordingly, the Court denies Defendants' third motion in limine without prejudice to a contemporaneous objection at trial.

## H.    Defendants' Motion in Limine No. 4

In their fourth motion in limine, Defendants move to preclude Plaintiff from referencing Verizon's revenue or profit on a total, per-customer, or per-unit basis.  (Doc. No. 287 at 1.)  Defendants argue that Verizon's revenue and profit numbers are irrelevant to the issues in this case because Plaintiff's damages expert does not rely on those numbers in performing his reasonable royalty analysis.  (<u>Id.</u> at 2-3.)  Defendants also argue that Verizon's revenue and profit should be excluded under the entire market value rule.  (<u>Id.</u> at 3-4.)

In response, Plaintiff argues that Verizon's revenue numbers are relevant to Dr.

---

[16]    The Court notes that in his deposition, Dr. Souissi referred to a Sprint commercial on YouTube featuring a family rather than a group of co-workers as depicted in Plaintiff's Exhibit 125.  (Doc. No. 289-5, Harkins Decl. Ex. 1 at 74.)  But a reasonable juror could conclude that this difference is due to an honest mistake by Dr. Souissi and that he was indeed referring to the commercial depicted in Plaintiff's Exhibit 125 during his deposition.

36

Kennedy's damages analysis, in particular to aid him in determining the economic comparability of the Broadcom license that he relies on in performing his damages analysis. (Doc. No. 289-6 at 1-3.) Plaintiff further argues that reference to Verizon's profit and revenue would not violate the entire market value rule. (Id. at 3-8.) In addition, Plaintiff argues that Verizon's revenue numbers are relevant to secondary considerations of nonobviousness. (Id. at 9.)

The Court agrees with Defendants that the probative value, if any, of Verizon's overall revenue and overall profit is substantially outweighed by the risk of unfair prejudice and, therefore, should be excluded. See Fed. R. Evid. 403; HTC Corp. v. Tech. Properties Ltd., No. 5:08-CV-00882-PSG, 2013 WL 4782598, at *6 (N.D. Cal. Sept. 6, 2013); see also Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."); LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 68 (Fed. Cir. 2012) ("Admission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is 'adequate to compensate for the infringement.'"). Nevertheless, the Court agrees with Plaintiff that it should be permitted to present evidence and testimony disclosing Defendants' per-unit revenue or per-unit profit. This information is relevant to the damages issues in this case, and the probative value of such evidence is not substantially outweighed by the risk of unfair prejudice.[17]

---

[17] The Court rejects Defendants' citation to this Court's prior ruling in Multimedia Patent Trust v. Apple Inc., No. 10-CV-2618-H (KSC), 2012 WL 12868264, at *6 (S.D. Cal. Nov. 20, 2012). Defendants assert that in that order, the Court excluded any mention of the defendants' revenue or profit, on an overall, per-customer, or per-unit basis. (Doc. No. 287 at 5; Doc. No. 290 at 2.) That is not correct. The Court's prior order only excluded reference to the defendants' overall profits and revenues.

1      In addition, the Court cannot conclude at this stage in the proceedings that Plaintiff's
2 use of Verizon's per-unit revenue or per-unit profit would violate the entire market value
3 rule.  The Federal Circuit has explained that a patentee may assess damages based on the
4 entire market value of the accused product if the patentee establishes that the patented
5 feature creates the basis for customer demand or substantially creates the value of the
6 component parts.  <u>Virnetx</u>, 767 F.3d at 1326.  Here, Plaintiff asserts that it will be able to
7 establish at trial that the patented aspects of the MiFi devices drive consumer demand.
8 (Doc. No. 289-6 at 4-5.)  Thus, it would improper at this time to exclude certain evidence
9 based on the entire market value rule.  To the extent Defendants might contend that
10 Plaintiff's evidence related to consumer demand is insufficient as a matter of law (Doc.
11 No. 290 at 4-5), such arguments would have more appropriately been raised at summary
12 judgment rather than through a motion in limine.

13      Accordingly, the Court grants in part and denies in part Defendants' fourth motion
14 in limine.  The Court excludes any testimony or evidence disclosing Verizon's overall
15 revenue or overall profit for the accused products.[18]  The Court denies the remainder of
16 Defendants' motion in limine without prejudice to a contemporaneous objection at trial.

17     I.     Defendants' Motion in Limine No. 5

18      In their fifth motion in limine, Defendants move to exclude any evidence, argument,
19 or testimony regarding the 2014 PWC Litigation Report referenced in the supplemental
20 expert report of Plaintiff's damages expert, Dr. Kennedy.  (Doc. No. 242 at 1.)  Defendants
21 argue that the litigation report is unreliable hearsay.  (<u>Id.</u> at 2.)  Defendants further argue
22 that the report should be excluded under Rule 403 because presenting the jury with general
23 litigation success rates has a high risk of causing unfair prejudice and of misleading or

---

25 See <u>Multimedia Patent Trust</u>, 2012 WL 12868264, at *6.  It made no mention of per-customer or per-
26 unit revenue or profit.  See <u>id.</u>

27 [18]    If at trial Plaintiff contends that Defendants opened the door to such evidence allowing it to
28 disclose these financial numbers, Plaintiff must make a further showing to the Court outside the
presence of the jury prior to presenting any evidence or testimony disclosing such financial numbers.

16-cv-118-H-KSC

confusing the jury.  (Id. at 2-4.)

In response, Plaintiff argues that the PWC report is a standard publication that sets forth noncontroversial statistics regarding patent litigation.  (Doc. No. 262 at 1.)  Plaintiff argues that the report is relevant to the damages issues in this case and it is not hearsay.  (Id. at 1-3.)

"To properly carry [its] burden [of proving damages], the patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'"  Uniloc, 632 F.3d at 1315.  "If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded."  Id.; see also id. at 1317 ("To be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'").  In light of these principles, the Federal Circuit has rejected damages expert testimony that is "insufficiently tied to the facts of the case."  Virnetx, 767 F.3d at 1334; see Uniloc, 632 F.3d at 1318 ("[I]t is clear that [the damages expert]'s testimony was based on the use of the 25% rule of thumb as an arbitrary, general rule, unrelated to the facts of this case.").

In his supplemental expert report, Plaintiff's damages expert relies on statistics from the PWC report showing that from 1995 to 2013 patent cases that proceeded to trial were decided in the plaintiff's favor approximately one-third of the time and that from 2007 to 2011 approximately 71% of the cases were appealed.  (Doc. No. 187-1, Zisser Decl. Ex. F at 29.)  Plaintiff's damages expert relies on these statistics in his reasonable royalty analysis to justify an upward adjustment of the royalty rate.  (Id.)

The Court agrees with Defendants that the litigation report should be excluded.  The PWC report provides general statistics that are untethered to the facts in this case and, therefore, should be excluded.  See Virnetx, 767 F.3d at 1334; Uniloc, 632 F.3d at 1315; see, e.g., Avocent Redmond Corp. v. Rose Elecs., No. C06-1711RSL, 2013 WL 8844098, at *5 (W.D. Wash. Mar. 11, 2013) (excluding damages expert testimony that attempted to rely on national litigation statistics because "[t]he fact that patent holders are successful in only 33% of cases nationwide tells us nothing about the actual or perceived strength of

[plaintiff]'s claims as it was negotiating the settlement with [defendant]").  Further, the Court agrees with Defendants that the limited probative value of the PWC report is substantially outweighed by the danger of undue prejudice and misleading the jury.  See Fed. R. Evid. 403.  Accordingly, the Court grants Defendants' fifth motions in limine.  The Court excludes any argument, testimony, or evidence regarding the PWC Report.[19]

### Conclusion

For the reasons above, the Court:

1.      Grants in part and denies in part without prejudice Plaintiff's Daubert motions;

2.      Denies without prejudice Defendants' Daubert motions;

3.      Denies without prejudice Plaintiff's motions in limine;

4.      Grants in part and denies in part without prejudice Defendants' motions in limine.

**IT IS SO ORDERED.**

DATED:  April 3, 2017

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[19]      At the hearing on the parties' motion in limine, Plaintiff stated that it would no longer be seeking to introduce the PWC Report at trial.

40